IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF NEW MEXICO


    KIMBERLY BECK and TRAVIS LORENTZ,
    INDIVIDUALLY and as PERSONAL
    REPRESENTATIVES of CHARLES "GAGE"
    LORENTZ, DECEASED,

          Plaintiffs,

    VS.                          No. 2:20-cv-01280-MV-SMV

    UNITED STATES OF AMERICA and
    ROBERT JOHN MITCHELL, INDIVIDUALLY
    and in his OFFICIAL CAPACITY as a
    NATIONAL PARK RANGER,

          Defendants.



          *****************************************
          VIDEOTAPED DEPOSITION OF RANGER ROBERT JOHN MITCHELL
                          March 29, 2022
                          9:09 a.m.
                201 Third St. NW, Suite 900
                Albuquerque, New Mexico 87102
          *****************************************



          PURSUANT TO THE FEDERAL RULES OF CIVIL
    PROCEDURE, this deposition was:



    TAKEN BY:   Ms. Shannon L. Kennedy
                ATTORNEY FOR PLAINTIFFS


    REPORTED BY:Annette G. Aragon, NM CR #197
                Paul Baca Professional Court Reporters
                500 Fourth Street NW, Suite 105
                Albuquerque, New Mexico  87102

Exhibit A

Page 142

1    Q.  Have you ever been trained when using a
2  Taser to control a resisting subject to avoid the chest
3  area?
4    A.  No.  The chest is the optimal area.
5    Q.  That's your training, that the chest is the
6  optimal area?
7    A.  Yes.
8    Q.  Have you received any training about cardiac
9  arrest arising from Taser probes going into the chest of
10  a subject?
11    MS. LYMAN:  Objection.  Form and foundation.
12    A.  It's been discussed in training that that
13  could occur.
14    Q.  (BY MS. KENNEDY)  So in spite of the fact
15  it's been discussed in training that by shooting someone
16  in the chest with a Taser that you have a cardiac arrest,
17  you still do not consider that to be a no-strike zone?
18    MS. LYMAN:  Objection.  Form and foundation.
19    A.  No.
20    Q.  (BY MS. KENNEDY)  Why not?
21    A.  Well, the chest is the optimal area.
22    Q.  That's what you were trained, that the chest
23  was the optimal area for --
24    A.  It's the large --
25    Q.  -- the probe?

Page 143

1    A.  It's typically the largest area on most
2  people.
3    Q.  My question was:  Was it your training that
4  shooting a probe into the chest of a subject that was
5  unarmed was the optimum area for putting the probes on a
6  subject?
7    A.  Yes.
8    MS. LYMAN:  Objection.  Form and foundation.
9    Q.  (BY MS. KENNEDY)  And did you receive that
10  training months before March of 2020?
11    MS. LYMAN:  Objection.  Form.
12    A.  I believe that has come up in every training
13  that I've attended.
14    Q.  (BY MS. KENNEDY)  When you pull the trigger
15  on the Taser to make a probe -- or cartridge one, how
16  many times do you pull the trigger?
17    A.  You would pull it once to deploy the
18  cartridge.
19    Q.  Okay.  And what happens if you pull it once
20  and deploy the cartridge and it doesn't hit the subject
21  or the subject doesn't respond to it?
22    A.  Okay.  Then you would normally deploy the
23  second cartridge.
24    Q.  Why would that be normally the next thing
25  you do?

Page 144

1    A.  The Taser device carries two cartridges; if
2  you've used one, then you would use the other.
3    Q.  And would you use the other by pulling the
4  trigger once again?
5    A.  Yes.
6    Q.  Is there any time you were trained to pull
7  the trigger more than twice to deploy cartridge one and
8  cartridge two?
9    MS. LYMAN:  Objection.  Foundation.
10    A.  No, not that I remember.
11    Q.  (BY MS. KENNEDY)  Okay.  So did you act
12  pursuant to your training when deploying a Taser to pull
13  the trigger once to deploy cartridge one and once to
14  deploy cartridge two?
15    MS. LYMAN:  Objection.  Form.  Foundation.
16    A.  Yes.
17    Q.  (BY MS. KENNEDY)  Were you also trained
18  to -- in the tactic of drive stun?
19    A.  Yes.
20    Q.  And how do you deploy a Taser in drive-stun
21  mode?
22    A.  So once both cartridges have been deployed,
23  you can use the Taser in drive-stun by making contact
24  with the suspect's skin.
25    Q.  And what's -- when you say "make contact,"

Page 145

1  you make contact with the end of the Taser onto the
2  suspect's skin.  Correct?
3    A.  Yes.
4    Q.  And once you do that, how many times do you
5  pull the trigger?
6    MS. LYMAN:  Objection.  Foundation.
7    Q.  (BY MS. KENNEDY)  In your experience and
8  training.
9    A.  Okay.  You would do it once and then
10  reassess.
11    Q.  And you pull the trigger once and reassess.
12    A.  Yes.
13    Q.  You are aware when you pull a cartridge that
14  the Taser cycles for five seconds?
15    A.  Yes.
16    Q.  Once you pull the first cartridge, have you
17  been trained to reassess?
18    MS. LYMAN:  Objection.  Foundation.
19    A.  Yes.
20    Q.  (BY MS. KENNEDY)  And then you pull the
21  second cartridge.  It cycles for another five seconds.
22  Correct?
23    A.  Yes.
24    Q.  And then you're trained after you do that,
25  you reassess?

37 (Pages 142 to 145)

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

Exhibit A

Page 170

1  asking me?

2      Q.  (BY MS. KENNEDY)  Did you understand that a

3  Taser is effective for a limited period of time?

4      A.  Yes.

5      Q.  And yet you thought -- decided to take the

6  fight to Gage to subdue him with a Taser that you knew

7  was effective only for a limited period of time.

8      A.  Yes.

9      Q.  You shot the Taser once.  Correct?

10     A.  Yes.

11     Q.  And it did not subdue him?

12     A.  Correct.

13     Q.  And then you decided to close distance on

14  Gage to subdue him with the Taser.

15         MS. LYMAN:  Objection.  Form and foundation.

16     Q.  (BY MS. KENNEDY)  Is that correct?

17     A.  I believe I deployed the second cartridge.

18     Q.  So your testimony here today under oath is

19  you now believe you deployed the second cartridge before

20  you closed distance on Gage?

21     A.  That's what I think.

22     Q.  Why do you think that now?

23     A.  I think that I thought that all along.

24     Q.  Why do you think -- why do you think that's

25  what happened?

Page 171

1      A.  To the best of my knowledge, I deployed both

2  cartridges.  I can't remember everything.

3      Q.  So the best of your knowledge, you deployed

4  both cartridges before closing distance on Gage?

5      A.  Yes.

6      Q.  So after both cartridges failed to subdue

7  Gage, you thought you could close distance on Gage and

8  subdue him with the Taser?

9         MS. LYMAN:  Objection.  Form and foundation.

10     A.  Yes.

11     Q.  (BY MS. KENNEDY)  And why did you think you

12  could subdue Gage with the Taser in your hand by closing

13  distance on him?

14     A.  That's consistent with the training.

15     Q.  How is that consistent with the training?

16     A.  The use of the drive-stun.

17     Q.  So you thought you could close distance on

18  Gage Lorentz and use this Taser in drive-stun mode to

19  subdue him?

20     A.  Yes.

21     Q.  Why?

22     A.  That's consistent with the training on using

23  the Taser.

24     Q.  How is that consistent on the training on

25  using the Taser?

Page 172

1      A.  That's what we're taught.  You can deploy

2  the cartridge.  You can deploy the second cartridge.  And

3  if you have a dart in the suspect, you may attempt to

4  drive stun.

5      Q.  So when you closed distance on Gage to

6  attempt to drive stun him, you thought you had a dart in

7  him?

8      A.  Yes.

9      Q.  Why did you think that?

10     A.  I could see it in his chest.

11     Q.  You could also see that he was not becoming

12  incapacitated.  Correct?

13     A.  Yes.

14     Q.  You could see the dart in his chest or you

15  could see the dart in his jacket?

16     A.  It was in his jacket.

17     Q.  So you could not see whether the dart had

18  actually gotten into his skin?

19     A.  Correct.

20     Q.  And in fact, given his physical reaction, it

21  appeared that the dart had not gotten into his skin.

22         MS. LYMAN:  Objection.  Form and foundation.

23     Q.  (BY MS. KENNEDY)  Correct?

24     A.  No.  It -- there's no way for me to tell

25  that.

Page 173

1      Q.  Well, you could tell that it wasn't

2  incapacitating him.  Correct?

3      A.  I could tell that it wasn't incapacitating

4  him.  That's correct.

5      Q.  And so you're saying:  I don't know how many

6  prongs were or were not in him.  All I could was there

7  was a prong in his jacket before I closed distance.  Is

8  that what you're testifying to?

9      A.  Yes.

10     Q.  Would it be objectively reasonable to take

11  the fight to another person when you know you're going to

12  lose the fight?

13         MS. LYMAN:  Objection.  Form and foundation.

14     A.  Could you please repeat that.

15     Q.  (BY MS. KENNEDY)  Would it be objectively

16  unreasonable to take the fight to another person when you

17  know you're going to lose the fight?

18     A.  Yes.

19     Q.  Would you agree with me that it is

20  objectively unreasonable to take the fight to another

21  person unless you reasonably believe that you are capable

22  of subduing the other person without resort to deadly

23  force?

24         MS. LYMAN:  Objection.  Form and foundation.

25     A.  I believe that, yes, that you could subdue

44 (Pages 170 to 173)

Exhibit A

Page 194

1  walkthrough?
2      A. I didn't know that we were doing a
3  walkthrough and I don't know who suggested it.
4      Q. Did you have any concerns about giving a
5  statement to law enforcement agencies after having taken
6  a human life?
7      MS. LYMAN: Objection. Form and foundation.
8      A. No.
9      Q. (BY MS. KENNEDY) And why not?
10     A. I believe that it's consistent with my
11  training, that you would be expected to give a statement
12  following an officer-involved shooting.
13     Q. So -- so you thought you were giving a
14  statement involving an officer-involved shooting to
15  fellow law enforcement officers who were investigating
16  whether the shooting was justified?
17     MS. LYMAN: Objection. Form and foundation.
18     A. Yes.
19     Q. (BY MS. KENNEDY) You didn't think that you
20  were potentially facing criminal charges?
21     A. No, I don't think I was thinking that.
22     Q. Why weren't you concerned that you could be
23  potentially facing criminal charges after having taken a
24  human life?
25     MS. LYMAN: Objection. Form.

Page 195

1      A. I knew that that was a possibility, but
2  nobody had ever told me that I was going to be charged
3  with anything.
4      Q. (BY MS. KENNEDY) Okay. So you knew it was
5  a possibility that you could be charged for taking Gage
6  Lorentz's human life, but was it kind of, like, highly
7  unlikely in your mind?
8      MS. LYMAN: Objection. Form.
9      A. I had believed that I had acted
10  appropriately as an officer.
11     Q. (BY MS. KENNEDY) So because it was your
12  belief -- it was your belief that you acted
13  appropriately as an officer based on your training by the
14  National Park Service?
15     A. Yes.
16     Q. What other informed your belief that you had
17  acted appropriately as an officer?
18     A. I don't think there was anything else.
19     Q. So it was solely based on your training with
20  the National Park Service, training such as bring the
21  fight to them, that you thought you could acted
22  appropriately as an officer?
23     MS. LYMAN: Objection. Form and foundation.
24     A. I'm not sure that I understand that
25  question.

Page 196

1      Q. (BY MS. KENNEDY) Based on your training at
2  the time of this walkthrough, you had no understanding or
3  awareness that you had done anything wrong?
4      MS. LYMAN: Objection. Form.
5      A. It was my understanding that we'd had a
6  shooting and it needed to be investigated. I was willing
7  and prepared to tell them what they were going to ask.
8      Q. (BY MS. KENNEDY) And you were willing and
9  prepared to tell them what they were going to ask because
10  it was your understanding you were involved in the
11  investigation of an officer-involved shooting.
12     A. Yes.
13     Q. And based on your training and experience,
14  you thought you had done nothing wrong.
15     MS. LYMAN: Objection. Form.
16     A. Correct.
17     Q. (BY MS. KENNEDY) I'm going to continue to
18  play Plaintiffs' Exhibit B.
19     (Video played.)
20     Q. (BY MS. KENNEDY) Okay. Is that you
21  pointing out a tire track that you believed was a tire
22  track of Gage Lorentz's vehicle? And that is at time 3
23  minutes and 13 seconds in Plaintiffs' Exhibit B.
24     MS. LYMAN: Objection. Foundation.
25     A. Yes.

Page 197

1      Q. (BY MS. KENNEDY) Why did you believe that
2  was a tire mark left by the driving of Gage Lorentz?
3      A. I think that it led up to where the sign
4  post had been.
5      Q. Did you see Gage Lorentz hit the sign post?
6      A. Yes.
7      Q. After you saw Gage Lorentz hit the sign
8  post, why didn't you call for backup?
9      MS. LYMAN: Objection. Form.
10     A. I saw him continuing to speed down towards
11  where I knew the boys were at the -- at the reservoir
12  there at Rattlesnake Springs.
13     Q. (BY MS. KENNEDY) So rather than call for --
14  you couldn't call for backup and follow him at the same
15  time?
16     MS. LYMAN: Objection. Form.
17     A. I might have been able to, but I didn't -- I
18  didn't have a good description of the vehicle.
19     Q. (BY MS. KENNEDY) Okay. So you might have
20  been able to call for backup and let them know that you
21  just saw someone in a white pickup truck hit a sign,
22  though. Correct?
23     MS. LYMAN: Objection. Form and foundation.
24     A. I could have called, yes.
25     Q. (BY MS. KENNEDY) And after watching Gage

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

Exhibit A

Page 198

1  Lorentz drive where he was driving -- where this shows he
2  was driving -- and then hit a sign, why didn't you call
3  for backup at that time?
4      MS. LYMAN: Objection. Form.
5      A. It just didn't occur to me.
6      Q. (BY MS. KENNEDY) Had you ever experienced
7  anything like this where you had seen -- where you see a
8  driver driving down a dirt road and hitting a sign?
9      A. Yes.
10      Q. Pursuant to your training, had you been
11  trained that it would have been objectively reasonable at
12  that point to call for backup?
13      MS. LYMAN: Objection. Form and foundation.
14      A. I could have called for backup.
15      Q. (BY MS. KENNEDY) And, in fact, it would
16  have been objectively reasonable for you to call -- call
17  for backup after observing Gage Lorentz's driving.
18      MS. LYMAN: Objection. Form and foundation.
19      Q. (BY MS. KENNEDY) Don't you agree?
20      A. Yeah, I could have.
21      Q. And it would have been objectively
22  reasonable to do so, don't you agree?
23      MS. LYMAN: Objection. Form and foundation.
24      A. Some officers might have called for backup,
25  which would make it objectively reasonable.

Page 199

1      Q. (BY MS. KENNEDY) So after you viewed Gage
2  Lorentz hit the sign, it would have been objectively
3  reasonable to call for backup. You agree?
4      MS. LYMAN: Objection. Form and foundation.
5      A. I could have, yes.
6      Q. (BY MS. KENNEDY) I'm not asking whether you
7  could have. You've answered that question. I'm asking
8  you whether, in your experience as a law enforcement
9  officer, it would be objectively reasonable for an
10  officer to call for backup after seeing Gage Lorentz's
11  driving.
12      A. Yes.
13      Q. When you were testifying earlier about Jared
14  Rostro -- Jared Rostro calling you, you said after the
15  phone call you reviewed some -- some things in writing.
16  What did you review?
17      A. I didn't review anything. I don't recall
18  reviewing anything. I didn't have anything that I could
19  look at. There was still an open investigation.
20      Q. So what -- what did you think when he said,
21  "There's some inconsistencies between what you told me
22  and the evidence"? What -- what came to mind?
23      MS. LYMAN: Objection. Form.
24      A. Consistent with my training, we know that
25  people who have been traumatized in any capacity --

Page 200

1  whether it's an assault, some other criminal act, a
2  traffic accident -- often don't remember all the details
3  of the incident. That would have been covered in my law
4  enforcement academies.
5      Q. (BY MS. KENNEDY) And do you recover
6  memories of the incident at a later date?
7      MS. LYMAN: Objection. Foundation.
8      A. I think that it's possible that somebody
9  will never remember, and it's possible that people will
10  have things come to their mind weeks or months or days
11  later.
12      Q. (BY MS. KENNEDY) When Jared -- when Jared
13  Rostro told you that there were inconsistencies between
14  what you had said to him and the facts, did you think
15  that, "Oh, yes. I now know that I gave incorrect
16  information during the walkthrough of the shooting of
17  Gage Lorentz"?
18      MS. LYMAN: Objection. Form and foundation.
19      A. No, I didn't think that.
20      Q. (BY MS. KENNEDY) Okay. Do you think that
21  sitting here today?
22      A. No.
23      Q. I'm going to continue with the playing of
24  Plaintiffs' Exhibit B.
25      (Video played.)

Page 201

1      Q. (BY MS. KENNEDY) I'm going to stop you
2  there at Plaintiffs' Exhibit B, four minutes and
3  four seconds. You say you didn't turn on your lights.
4  Is that true?
5      MS. LYMAN: Objection. Foundation.
6      Q. (BY MS. KENNEDY) What's that?
7      A. I did turn on my lights.
8      Q. Okay. So at what point did you turn on your
9  lights?
10      A. As I was turning around to go after the
11  vehicle.
12      Q. Okay. So -- so what you did say to the
13  officers during the walkthrough is that as you began to
14  turn around, you turned on your lights to -- is that
15  correct?
16      A. I think that's correct.
17      Q. Okay. I'm going to go back a little bit.
18      (Video played.)
19      Q. (BY MS. KENNEDY) When you say, "I didn't
20  sound the siren, that I recall," what are you talking
21  about?
22      A. Okay. You can activate the lights without
23  activating the siren.
24      Q. Why didn't you activate the siren?
25      A. He saw me, drove right around me. And I

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

Exhibit A

Page 206

1   you have one?
2       MS. LYMAN: Objection. Form.
3       A. No. I think that it has the potential to be
4   a useful tool.
5       Q. (BY MS. KENNEDY) Okay. So you would prefer
6   to have a dash camera rather than not have a dash camera.
7       A. Yes.
8       Q. Did you ever ask for someone at the Carlsbad
9   National Cavern to fix your dash camera so that would
10  have an ability to document what you were doing while
11  working?
12      MS. LYMAN: Objection. Form.
13      A. No.
14      Q. (BY MS. KENNEDY) Did there come a time
15  where you learned that your body-worn camera had not
16  functioned properly during your encounter with
17  Mr. Lorentz?
18      A. The first time I became aware of that was in
19  the interview with Detective Rostro.
20      Q. When did Detective Rostro tell you that the
21  body-worn camera had malfunctioned during your contact
22  with Gage?
23      A. He asked me did I ever turn it off during
24  the contact. And I remember telling him no.
25      Q. Did Detective Rostro ever have a

Page 207

1   conversation with you that was not recorded, to your
2   knowledge?
3       A. Only that phone call after the district
4   attorney closed out the case.
5       Q. When did Detective Rostro tell you that he
6   had watched the body-worn camera?
7       MS. LYMAN: Objection. Foundation.
8       A. I don't know.
9       Q. (BY MS. KENNEDY) But he did tell you that
10  he watched the body-worn camera before you gave a
11  recorded statement.
12      A. I believe it's someplace in the interview.
13      Q. Okay. So you believe that during your first
14  interview, before the walkthrough, Detective Rostro told
15  you that the body-worn camera had not functioned
16  properly.
17      A. He had asked me a question about whether or
18  not I had ever turned it off. I don't know if he
19  specifically said that it didn't record or that it
20  malfunctioned. I don't -- I don't recall what he said.
21      Q. So you recall that he asked you whether you
22  had turned the camera off?
23      A. Yes.
24      Q. And what was your answer to that question?
25      A. No.

Page 208

1       Q. So did you know how to turn the camera off?
2       A. Yes. You have to press the button and hold
3   it for -- I think it's 30 seconds.
4       Q. So, based on your training, you believe that
5   you can turn the camera off by holding down the button
6   for 30 seconds.
7       A. It's not 30 seconds. I don't remember what
8   the amount of time was on that particular model. Thirty
9   seconds is the buffering time when it comes on. You have
10  to hold it down and it makes a beep.
11      Q. To turn it off?
12      A. Yes.
13      Q. And pursuant to your training that is how,
14  on March 21st of 2020, you would have turned your camera
15  off, by holding down the button that was near your chest?
16      A. Yes.
17      Q. And you demonstrated how you would have done
18  that?
19      A. Yes.
20      Q. Could you demonstrate that again, please.
21      A. Okay. So the camera's worn right here over
22  the sternum and there's a -- there's a circular button.
23  It's fairly big. You can use -- you know, you can turn
24  it on and off using the gloves when you're wearing
25  gloves.

Page 209

1       And you have to hold it down. And by
2   pushing in on it, then it will shut itself off, and there
3   will be an audio signal that it has shut off.
4       Q. And what is the aud-- -- aud-- -- aud-- -- what
5   is the signal it has shut off? What does it sound like?
6       A. I would describe it as a beep.
7       Q. Like, a high pitched, like, "beep"?
8       A. Yes.
9       Q. Okay. Did you hear that sound while you
10  were wrestling with Gage Lorentz?
11      A. No.
12      Q. Did you hear that sound at any time during
13  the time that you were present with Gage Lorentz?
14      MS. LYMAN: Objection. Form.
15      A. It makes the same audio signal when you turn
16  on. So when I turned on the camera, it would have made
17  the same sound.
18      Q. (BY MS. KENNEDY) Okay. Other than -- when
19  did you turn on the camera?
20      A. After I exited the vehicle.
21      Q. After you'd exited your own vehicle, as you
22  were exiting, you turned on the camera?
23      A. Yeah, I think so.
24      Q. Okay. I'm going to continue playing
25  Plaintiffs' Exhibit B.

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

Exhibit A

## Page 210

1    (Video played. )
2    Q.  (BY MS. KENNEDY)  Okay.  At 4:45 somebody in
3    a yellow shirt is holding up something.  Do you know what
4    that is?
5    A.  That's the cross-piece for the sign.
6    Q.  And do you have any -- had you deduced
7    any -- had you seen that before?  Do you know how that
8    got there?  What did you think when you saw that held up?
9    A.  That it had been thrown there from when the
10   driver struck the sign.
11   Q.  Did you see that happen?
12   A.  I did not notice it go through the air.
13   (Video played.)
14   Q.  (BY MS. KENNEDY)  Okay.  That was the
15   complete response we got from the Eddy County Sheriff's
16   Department of your first -- your walkthrough on that day.
17   On that day, how was your memory of the events on the day
18   you did the walkthrough?
19   MS. LYMAN:  Objection.  Form and foundation.
20   A.  I remember that there was a little bit of
21   confusion on where the vehicles were parked.
22   Q.  (BY MS. KENNEDY)  So on the day of the
23   walkthrough, during this walkthrough that you just saw,
24   do you stand by everything you said during this
25   walkthrough?

## Page 211

1    A.  From what I just saw, yes.  That was the
2    best of my memory.
3    Q.  And just clear for the record, you stand by
4    everything you said in Plaintiffs' Exhibit B during the
5    walkthrough of -- before you end up later on down the
6    road.  Right?  This was just at the entrance of the gate
7    of Rattlesnake Springs.  Correct?
8    A.  Right.  Where I first encountered the
9    incoming vehicle.
10   Q.  And so in Plaintiffs' Exhibit B, you stand
11   by everything you described in the walkthrough?
12   MS. LYMAN:  Objection.  Form.
13   A.  That's everything I could remember; so, yes.
14   Q.  (BY MS. KENNEDY)  Okay.  How would you
15   change anything that you felt you got wrong in
16   Plaintiffs' Exhibit B --
17   MS. LYMAN:  Objection.
18   Q.  (BY MS. KENNEDY) -- during the walkthrough?
19   A.  I don't know that there's anything to
20   change.
21   Q.  Okay.  So you wouldn't change anything in
22   Plaintiffs' Exhibit B in terms of what you said or
23   described.
24   A.  Nothing that I could think of, no.
25   Q.  When you first saw Gage Lorentz and deduced

## Page 212

1    that he had hit the sign, did you call out your location
2    to anyone at that time?
3    A.  No.
4    Q.  When was the first time you called out your
5    location in relation to your incident with Gage Lorentz?
6    A.  After the shooting.
7    Q.  I'm going to play for you now what has been
8    marked as Plaintiffs' Exhibit D, which is the walkthrough
9    of the scene of the shooting.
10   Did you go to the walkthrough at the scene
11   of the shooting immediately after the walkthrough of the
12   location where Gage Lorentz allegedly hit the sign?
13   A.  I thought that we did --
14   MS. LYMAN:  Objection.  Form.
15   Go ahead.
16   A.  I thought that we went to the shooting scene
17   and then went back to where the -- I had encountered him.
18   That's what it seems to me.
19   Q.  (BY MS. KENNEDY)  Okay.  That could be the
20   case.  I have no idea.  I was just given both videos.  I
21   don't know which thing happened first.
22   A.  Okay.
23   Q.  So it's your memory here today that you
24   first went to the scene of the shooting; and then, after
25   discussing the scene of the shooting, you then went back

## Page 213

1    to the scene where you had alleged that Gage had hit the
2    sign in the entrance to Rattlesnake Springs?
3    A.  I think that is correct.
4    Q.  Okay.  When you saw Gage driving from where
5    he had hit the sign down towards the location of the
6    shooting, how fast did you think he was going?
7    A.  I would have said 45 miles an hour.
8    Q.  And what is the speed limit on that road?
9    A.  Fifteen miles an hour.
10   Q.  And as you were driving towards him and he
11   was driving towards the sign, were you afraid he was
12   going to hit you with -- with his vehicle?
13   A.  Yes.  I thought he could.
14   Q.  Okay.  You thought he could or you thought
15   he would?
16   A.  Yeah.  I wasn't too sure.
17   Q.  I mean, often when I'm driving, I look at
18   someone and I'm, like, "That person can hit me.  They
19   could hit me," but I don't think they're really going to,
20   but -- you know.
21   A.  The speed was what concerned me because, of
22   course, it's gravel, which changes your -- your stopping
23   distance.
24   Q.  So you were concerned that he was speeding
25   down the gravel road?

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

Exhibit A

Page 214

1    A. (Nods head.)
2    Q. And the posted speed limit there is, what?
3    A. Fifteen.
4    Q. Okay. So he was going three times the legal
5  speed limit down a gravel road in a large truck.
6  Correct?
7    A. Yes.
8    Q. And based on your training and experience,
9  would you call this careless driving or reckless driving?
10    MS. LYMAN: Objection. Form and foundation.
11    A. I would say that -- that I would
12  characterize it under the 36 CFR 4.22, unsafe operations.
13  So...
14    Q. (BY MS. KENNEDY) Is that a petty
15  misdemeanor?
16    MS. LYMAN: Objection. Form and foundation.
17    A. That would be a misdemeanor.
18    Q. (BY MS. KENNEDY) Okay. Is it a traffic
19  offense?
20    A. Yes.
21    Q. Can you write a ticket for that?
22    A. Yes.
23    Q. Okay. So there's no need to arrest
24  Mr. Lorentz and put him in handcuffs and take him
25  anywhere in order to do justice.

Page 215

1    MS. LYMAN: Objection. Form and foundation.
2    A. I would have the authority to arrest him.
3    Q. (BY MS. KENNEDY) That's not my question.
4    A. Oh.
5    Q. You had the authority and discretion to
6  write him a ticket and let him go on his way. Correct?
7    A. Yes. I could have done that.
8    Q. Right. When you turn around and start
9  following him, at that point do you intend to charge him
10  with assault on an officer?
11    MS. LYMAN: Objection. Form and foundation.
12    A. No.
13    Q. (BY MS. KENNEDY) Okay. So when he was
14  driving towards you and you had to move over in the road
15  to allow him to go by, you just moved your vehicle over
16  and it was easy -- it was easy for you to get out of the
17  way. Correct?
18    MS. LYMAN: Objection. Form and foundation.
19    A. Okay. I don't remember the specifics. But
20  what I said there is I stopped the vehicle and let him go
21  around me.
22    Q. (BY MS. KENNEDY) Okay.
23    A. I don't think I even pulled over.
24    Q. Okay. So when you stopped the vehicle, Gage
25  Lorentz went around you, and at no point did you feel

Page 216

1  like he was going to hit you as he was driving around
2  you.
3    MS. LYMAN: Objection. Form and foundation.
4    A. No. I did think that the potential for him
5  hitting me was very real.
6    Q. (BY MS. KENNEDY) Okay. So what you did you
7  do? You just sat there and let him drive around you?
8    A. I -- I believe that what I did is I stopped,
9  because then you have at least a vehicle that's become a
10  stationary object rather than a moving object, and
11  probably put my foot on the brake and let him go around
12  me.
13    Q. Okay. And he was -- he easily drove around
14  you?
15    MS. LYMAN: Objection. Form and foundation.
16    A. Well, he drove around me, yes.
17    Q. (BY MS. KENNEDY) Did you see his face when
18  he was driving around you?
19    A. I didn't get a good look at him. There were
20  tinted windows.
21    Q. So you didn't know his expression as he was
22  driving around you?
23    A. No.
24    Q. He made no gestures towards you as he drove
25  around you?

Page 217

1    MS. LYMAN: Objection. Form and foundation.
2    A. Not that I recall.
3    Q. (BY MS. KENNEDY) Did you have any
4  indication as he drove around you that he even saw you?
5    MS. LYMAN: Objection. Form and foundation.
6    A. Yeah, I think he saw me.
7    Q. (BY MS. KENNEDY) Why do you think he saw
8  you?
9    A. Okay. It's the way he drove at me and then
10  swerved away.
11    Q. What about the way he drove at you and
12  swerved away made you think that he saw you?
13    A. I was just thinking about how close he got
14  and then -- and then suddenly veered away.
15    Q. So you thought he had good enough control of
16  his vehicle that he decided to get close to you and
17  swerve away in a way that was intentional?
18    MS. LYMAN: Objection. Form and foundation.
19    A. I think so.
20    Q. (BY MS. KENNEDY) When you turned your
21  car -- and why do you think so?
22    A. Just the driving behavior; he came in, he
23  came in fast, came in a big cloud of dust. And he seemed
24  to come at me and then veer away from me at the last
25  moment to avoid a collision as if he was just trying to

55 (Pages 214 to 217)

Exhibit A

Page 218

1   do something to get my attention.
2        Q.  So you thought that he intentionally swerved
3   away from you in a manner to get your attention.
4        A.  Perhaps.
5        Q.  Okay.  So at that point did you call for
6   backup?
7        A.  No.
8        Q.  Why not?  You just alleged that a driver had
9   nearly -- had threatened you by driving into you at
10  45 miles an hour in a 15-mile-an-hour road and swerved
11  away to avoid you at the last minute in a manner that
12  made you think he did so intentionally, which would
13  perhaps be battery on an officer.  Why didn't you call
14  for backup at that time?
15       MS. LYMAN:  Objection.  Form and foundation.
16       A.  At that time all I wanted to do was catch up
17  to the driver and talk to him.  And I didn't see a reason
18  to call for backup.
19       Q.  (BY MS. KENNEDY)  So pursuant to your
20  training, nothing in your training told you:  Huh, this
21  is very strange behavior.  Maybe it would benefit to have
22  someone else with me to help me talk to this person
23  that's engaging in this bizarre behavior.
24       MS. LYMAN:  Objection.  Form and foundation.
25       Q.  (BY MS. KENNEDY)  Didn't occur to you.

Page 219

1        A.  No.
2        Q.  When you turned your car around after Gage
3   drove in such a threatening manner towards you, were you
4   angry at that point?
5        MS. LYMAN:  Objection.  Form and foundation.
6        A.  No.
7        Q.  (BY MS. KENNEDY)  You weren't -- you weren't
8   angry?
9        A.  No.
10       Q.  How did you feel?
11       A.  My real -- my real sense of urgency was that
12  I wanted to get down to where he was headed before he
13  could encounter the boys I had seen walking around the
14  reservoir.
15       Q.  Had you talked to the boys that had been
16  walking around the reservoir prior to the shooting?
17       A.  No.
18       Q.  Prior to the shooting, had you made a
19  traffic stop earlier in that day?
20       A.  Not -- no, not that I remember.
21       Q.  When you stopped your vehicle and Gage had
22  stopped his vehicle, why did you fail to call for
23  assistance at that point?
24       A.  All I wanted to do was talk to the driver.
25  I didn't feel a need to call for backup.

Page 220

1        Q.  So the reason you failed to call for
2   assistance once Gage was stopped and you were stopped was
3   because you wanted to talk to him?
4        A.  Yes.
5        Q.  And at that point you didn't feel that you
6   had a need for backup.
7        A.  Correct.
8        Q.  At that point did you feel that his driving
9   was without due care?
10       MS. LYMAN:  Objection.  Form and foundation.
11       A.  Yes.
12       Q.  (BY MS. KENNEDY)  At that point did you feel
13  like his driving indicated to you that he may be under
14  the influence of an intoxicant?
15       MS. LYMAN:  Objection.  Form and foundation.
16       A.  No.
17       Q.  (BY MS. KENNEDY)  Have you had any training
18  to investigate driving under the influence?
19       A.  Yes.
20       Q.  And when were you last trained to
21  investigate driving under the influence?
22       A.  I had the initial training at the Federal
23  Law Enforcement Training Center and I'd had a refresher
24  in 2019.
25       Q.  Were you trained to ask someone whether

Page 221

1   they've had anything to drink?
2        MS. LYMAN:  Objection.  Form and foundation.
3        A.  That would be something that you could do
4   during the investigation phase of a traffic stop.
5        Q.  (BY MS. KENNEDY)  So you were trained that
6   it would be common, if you were investigating someone
7   under the influence of an intoxicant, to ask them whether
8   they'd had any alcohol to drink?
9        MS. LYMAN:  Objection.  Form and foundation.
10       A.  That would be -- that would be something
11  that you could ask after you've -- you've made contact
12  with the driver, yes.
13       Q.  (BY MS. KENNEDY)  And have you been trained
14  to investigate whether someone is under the influence of
15  drugs?
16       A.  Yes.
17       Q.  And have you been trained to ask them, "Have
18  you had any marijuana?  Are you under the influence of
19  any drugs?"
20       MS. LYMAN:  Objection.  Form.
21       A.  That would be something that you could ask
22  in the investigation process, yes.
23       Q.  (BY MS. KENNEDY)  Did you ever smell any
24  marijuana on Gage Lorentz?
25       A.  No.

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

Exhibit A

Page 230

```
 1   make you feel?
 2       A.  I'm not sure that I understand the question.
 3   I'm not sure that I felt anything different than what
 4   I've been feeling all along.
 5       Q.  Okay.  So watching the body-worn camera
 6   footage of Gage Lorentz dying didn't change the way that
 7   you had felt all along?
 8       MS. LYMAN:  Objection.  Form.
 9       A.  Yes.
10       Q.  (BY MS. KENNEDY)  I had stopped the video at
11   3 minutes and 34 seconds.  I'm going to start it again.
12           (Video played.)
13       Q.  (BY MS. KENNEDY)  Okay.  I'm going to stop
14   you there.
15           When you were testifying about deploying the
16   Taser and then walking up to him to do the drive-stun,
17   prior to walking up to him to do the drive-stun, why
18   didn't you call for backup?
19       MS. LYMAN:  Objection.  Form and foundation.
20       A.  The only thing I would have had at my
21   disposal was the handheld radio which does not work from
22   that location.
23       Q.  (BY MS. KENNEDY)  You couldn't walk back to
24   your vehicle?
25       A.  I wasn't going to turn my back on him.
```

Page 231

```
 1       Q.  Well, you could walk backwards, couldn't
 2   you?
 3       MS. LYMAN:  Objection --
 4       Q.  (BY MS. KENNEDY)  Couldn't you say, "Stay
 5   there.  I'm going to go call for backup?"
 6       MS. LYMAN:  Objection.  Foundation and form.
 7       Q.  (BY MS. KENNEDY)  You weren't able to
 8   communicate to Gage to stay put?
 9       A.  No.  I wasn't going to disengage from him.
10       Q.  Well, you're not disengaging if you're
11   talking to him while you're walking backwards to call for
12   backup.
13       MS. LYMAN:  Objection.  Form and foundation.
14       Q.  (BY MS. KENNEDY)  Are you?  Pursuant to your
15   training, can you walk backwards while talking to someone
16   and then call backup --
17       A.  I don't believe I've ever been trained to
18   walk backwards.
19       Q.  Okay.  So you've never been trained to
20   continue to talk to someone while making distance between
21   you and the subject so that you can call for backup.
22       A.  I'm capable of doing that, yes.
23       Q.  Okay.  How -- how are you capable of doing
24   that?
25       MS. LYMAN:  Objection.  Form.
```

Page 232

```
 1       A.  Okay.  I could have walked away from him and
 2   gotten on the radio inside the vehicle.  But I wasn't
 3   going to.  I wasn't -- I wasn't about to take my
 4   attention off of him.
 5       Q.  (BY MS. KENNEDY)  Okay.  So you think you
 6   would have had to take your attention off of him in order
 7   to create distance between you and Gage Lorentz in order
 8   to call for backup.
 9       MS. LYMAN:  Objection.  Form.
10       A.  Yes.
11       Q.  (BY MS. KENNEDY)  Why?
12       A.  Why -- I don't understand the "why."
13       Q.  I don't understand why you're saying you had
14   to break communication with Gage Lorentz in order to
15   retreat to the inside of your vehicle to call for backup.
16       MS. LYMAN:  Objection.  Form and foundation.
17       A.  I was not -- I was not going to walk away
18   from him.  I was not going to take my attention off of
19   him.
20       Q.  (BY MS. KENNEDY)  And I know that.  That's
21   what you said.
22       A.  Yes.
23       Q.  Right.  But I'm saying, well, couldn't you
24   keep your attention on him while retreating to call for
25   backup to your vehicle?
```

Page 233

```
 1       A.  I don't think that would be very effective.
 2       Q.  So you decided not to.
 3       A.  Yes.
 4       Q.  But you could have.
 5       A.  Yeah, I suppose I could have.
 6       Q.  And wouldn't you agree that it would have
 7   been objectively reasonable to create distance between
 8   you and Gage Lorentz after you shot the Taser at him and
 9   it failed to work?
10       MS. LYMAN:  Objection.  Form and foundation.
11       A.  No.
12       Q.  (BY MS. KENNEDY)  I'm going to start playing
13   plaintiffs' exhibit of the walkthrough of the scene at
14   4:10.
15           (Video played.)
16       Q.  (BY MS. KENNEDY)  So at the point where you
17   knew Gage Lorentz was not reaching for your pistol, at
18   that point when you decided to unholster your gun.
19       MS. LYMAN:  Objection.  Form.
20       A.  Yes.
21       Q.  (BY MS. KENNEDY)  At that point had you
22   decided to kill Gage Lorentz?
23       MS. LYMAN:  Objection.  Form and foundation.
24       A.  No.
25       Q.  (BY MS. KENNEDY)  So at the point that you
```

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

Exhibit A

Page 238

1    A.  The black thing sticking up.
2    Q.  Right.
3    A.  The --
4    Q.  It's within the holster and it comes back
5  and forth when you're using the holster.
6    A.  You're talking about the rotating strap.
7    Q.  Not the rotating strap.  I'm talking about
8  what's to the right of the rotating strap sticking
9  straight up.  Do you recognize what that is?
10    MS. LYMAN:  Objection.  Foundation.
11    A.  I don't recognize that.
12    Q.  (BY MS. KENNEDY)  You don't recognize what
13  that is.  What do you recognize, in terms of the photo in
14  Exhibit I, that would indicate it would prevent some
15  suspect from drawing your gun from this holster?
16    A.  It would have the retaining strap and then
17  there's a -- there's a thumb release that's on the inside
18  of the holster.
19    Q.  So the thumb release on the inside of the
20  holster, is that the black piece that is sticking up from
21  within the holster?
22    A.  I don't think we're seeing that from -- I
23  don't think we're seeing that.  That's...
24    Q.  You don't know what that is?
25    A.  There's a piece of plastic there that --

Page 239

1    Q.  Okay.  Why don't we hold up the exhibit so
2  we are talking about the same thing.  If you could hold
3  up the exhibit the way I'm holding it up towards you.
4    A.  (Witness complies.)
5    Q.  Okay.  So when you hold the exhibit like
6  this and you talk about this strap that is pulled back,
7  what is that?
8    A.  Okay.  This strap is a strap that goes over
9  the firearm while it's in the holster.
10    Q.  Okay.  So that was over the firearm in your
11  holster when you were with Gage Lorentz.
12    A.  Yes.
13    Q.  Okay.  What about the black piece that my
14  thumb is on now?  What is that?
15    A.  Okay.  That -- that's a piece of plastic
16  that's designed to help keep from reaching past.
17    Q.  So what is that piece of plastic called that
18  prevents a suspect from reaching past your gun and
19  pulling it out of the holster?
20    MS. LYMAN:  Objection.  Foundation.
21    Q.  (BY MS. KENNEDY)  What --
22    A.  I'm not familiar with the name for that
23  piece.
24    Q.  What does your training tell you about how
25  that piece prevents someone from pulling your -- from

Page 240

1  getting to your gun?
2    A.  It's just a shield.
3    Q.  It's just a shield, but it's a shield that's
4  used to prevent people from getting to your gun.
5  Correct?
6    MS. LYMAN:  Objection.  Form.
7    A.  Yeah.  It -- it works in tandem with the
8  rest of the -- of the retaining devices.
9    Q.  (BY MS. KENNEDY)  Okay.  So then directly to
10  the left of that back -- black piece within the holster,
11  what is that?
12    MS. LYMAN:  Objection.  Form.
13    Q.  (BY MS. KENNEDY)  If you know.
14    A.  It looks to me like the strap that goes onto
15  the belt.
16    Q.  Okay.  So you think that that is a strap
17  that connects it to a belt?
18    A.  Yes.
19    Q.  Okay.  And so what other function within the
20  holster itself presents -- prevents someone from drawing
21  your Sig 220 out of this holster?
22    A.  Okay.  There are -- there's a release
23  mechanism that's on the inside of the holster.
24    Q.  And what is --
25    A.  And I don't think we see that in this photo.

Page 241

1    Q.  And -- right.  And within the holster, you
2  need to push that release mechanism in order to draw the
3  gun.  Correct?
4    MS. LYMAN:  Objection.  Form and foundation.
5    A.  Correct.
6    Q.  (BY MS. KENNEDY)  So the holster locks the
7  gun in place within your holster.  Correct?
8    A.  Yes.
9    Q.  And it locks the Sig 220 in place within
10  this holster.  Correct?
11    A.  Yes.
12    Q.  So you had a holster that matched your gun
13  so that the gun could not be removed from your holster by
14  a suspect.
15    MS. LYMAN:  Objection.  Form and foundation.
16    Q.  (BY MS. KENNEDY)  Correct?
17    A.  All it does is it makes it harder for a
18  suspect to remove the gun from the holster.
19    Q.  Right.  But how in the world can a suspect
20  remove a gun from a holster if it's locked within the
21  holster?
22    MS. LYMAN:  Objection.  Form and foundation.
23    A.  Any of these pieces are breakable.
24    Q.  (BY MS. KENNEDY)  But in a hand-to-hand
25  match, how does a suspect break any of the pieces within

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

Exhibit A

Page 250

1    Q.  Was the second shot -- if you did not intend
2  to shoot him the second time, when the firearm went off
3  the second time, did you intend to kill Gage Lorentz at
4  that moment?
5        MS. LYMAN: Objection.  Form and foundation.
6    A.  No.
7        MS. KENNEDY:  I'm going to close this out.
8  It's 3:52.  I would like to take a ten-minute break at
9  this point.  Wait.  Wait.  Before we take a break, is
10  there something I need to clarify before we go on break?
11        (Discussion held off the record.)
12    Q.  (BY MS. KENNEDY)  It was -- I understood
13  your testimony to be -- but I just want to clarify it --
14  that you did not intend to shoot Gage Lorentz the second
15  time.
16    A.  When I shot him the first time, I had hoped
17  that would stop the altercation.  And I thought that it
18  was possible that the first shot didn't hit him.  And the
19  second shot was deliberate.
20    Q.  So you intended to shoot him the second
21  time?
22    A.  Yes.
23    Q.  Because you didn't know whether you had shot
24  him the first time.
25    A.  He was continuing to resist.

Page 251

1    Q.  Okay.  What I'm trying to understand is, you
2  said you intended to shoot him the first time.  Right?
3    A.  Yes.
4    Q.  But you don't know whether you hit him the
5  first time?
6    A.  Correct.
7    Q.  And you were still on the ground with Gage
8  the first time you shot him?
9    A.  Yes.
10    Q.  And at that point did you get up and back
11  away and shoot him again?
12        MS. LYMAN: Objection.  Form and foundation.
13    A.  No.
14    Q.  (BY MS. KENNEDY)  Okay.  But that's what you
15  told the officers during the walkthrough.
16    A.  Yes.
17    Q.  Okay.  Why were you mistaken as to when --
18  and you also told the officers that while you were
19  standing up and backing away is when Gage stood up and
20  was coming for you.  Do you remember saying that?
21    A.  I do remember saying that.
22    Q.  And that's also inaccurate.  Right?
23    A.  Yes.
24    Q.  Why did you tell the officers that Gage had
25  stood up and was coming towards you when in fact he never

Page 252

1  did that?
2        MS. LYMAN: Objection.  Form and foundation.
3    A.  It was what I remembered at the time.
4    Q.  (BY MS. KENNEDY)  Okay.  So what you
5  remembered at the time and told the officers at the time
6  was wholly inaccurate.
7        MS. LYMAN: Objection.  Form and foundation.
8    Q.  (BY MS. KENNEDY)  You would agree?
9    A.  I don't think it was completely inaccurate.
10  I was truthful about shooting him twice.
11    Q.  Well, but you -- you weren't truthful about
12  shooting him twice insofar as you said you shot him once
13  and didn't know if you'd hit him.  Right?
14        MS. LYMAN: Objection.  Form and foundation.
15    A.  Correct.
16    Q.  (BY MS. KENNEDY)  All right.  So the first
17  time you shot, you intended to shoot.  And you say it's
18  true that you shot a man in the leg and didn't know you'd
19  hit him.
20        MS. LYMAN: Objection.  Form.
21    Q.  (BY MS. KENNEDY)  Is that your testimony
22  under oath; that you shot a man in the leg while you were
23  both on the ground and you didn't know whether you'd hit
24  him?
25    A.  Yes.  We know that to be true now.

Page 253

1    Q.  Okay.  How do you know that to be true now?
2    A.  Well, I've been -- I've been told that both
3  shots were -- hit Mr. Lorentz.
4    Q.  Okay.  So at the time that you were on the
5  ground with Mr. Lorentz, it's your testimony under oath
6  today that when you were both on the ground and you shot
7  him in the leg, you didn't know that you'd hit him in the
8  leg?
9    A.  Correct.
10    Q.  All right.  And then when you shot the gun a
11  second time, it's your testimony under oath today that
12  you intended to shoot him a second time.
13    A.  Yes.
14    Q.  But you don't know whether when you shot him
15  the second time -- it's your testimony under oath that
16  when you shot him the second time, you didn't know where
17  you'd hit him?
18        MS. LYMAN: Objection.  Form and foundation.
19    A.  I did not know.
20    Q.  (BY MS. KENNEDY)  Okay.  But your testimony
21  is under oath here today that you intended to shoot him a
22  second time.
23    A.  I delivered a second shot in an attempt to
24  stop the fight when I found no reaction to the first
25  shot.

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

Exhibit A

Page 262

```
1         Q.  Based on what?  Based on your memory that we
2   now know is inaccurate of what happened?
3         MS. LYMAN:  Objection.  Form and foundation.
4         A.  That's what I perceived in that moment.
5         Q.  (BY MS. KENNEDY)  Sitting here today you're
6   now saying that what you perceived after watching the
7   video is that after you had shot Gage in the leg that he
8   was still fighting you.
9         MS. LYMAN:  Objection.  Form and foundation.
10        A.  Yes.
11        Q.  (BY MS. KENNEDY)  Are you saying he took a
12   swing at you?  Are you saying that he tried to kick you?
13        A.  I believe that we were in -- we were
14   fighting over the weapon itself.
15        Q.  Do you believe that Gage was afraid you
16   would kill him?
17        MS. LYMAN:  Objection.  Form and foundation.
18        A.  I don't know.  I don't know what he was
19   thinking.
20        Q.  (BY MS. KENNEDY)  Right.  How was he a
21   deadly threat when you had shot him a second time?
22        MS. LYMAN:  Objection.  Form and foundation.
23        A.  He'd already fought with me over my weapon,
24   and I wasn't going to give him an opportunity to take it.
25        Q.  (BY MS. KENNEDY)  So the second time you
```

Page 263

```
1   shot him it was so he could never have an opportunity
2   ever again to take your weapon?
3         MS. LYMAN:  Objection.  Form and foundation.
4         A.  It was to end the fight.
5         Q.  (BY MS. KENNEDY)  After you shot him the
6   first time in the leg and he was on the ground, did you
7   take time to reassess to determine whether you needed to
8   take another shoot?
9         MS. LYMAN:  Objection.  Form and foundation.
10        A.  I didn't have that luxury.
11        Q.  (BY MS. KENNEDY)  Okay.  So your answer is
12   no; after you shot him and he was on the ground, you did
13   not take time to reassess to determine whether you needed
14   to shoot him again?
15        A.  I shot him until the threat ceased, which is
16   consistent with my training.
17        Q.  Okay.  But that's not my -- that's not my
18   question.  My question is:  After you shot him the first
19   time, as you can see on the video -- now that you can
20   watch the video -- you shot him the first time and he's
21   on back and you shot him in the leg, after you shot him
22   the first time, did you take time to reassess to see
23   whether you needed to shoot him again?
24        MS. LYMAN:  Objection.  Form and foundation.
25        A.  No.  The only thing I believed was that I
```

Page 264

```
1   had missed.
2         Q.  (BY MS. KENNEDY)  Right.  So you didn't take
3   time after you shot the first time to see whether you had
4   even hit him?
5         MS. LYMAN:  Objection.  Form and foundation.
6         A.  There was nothing that indicated that I hit
7   him; so I shot a second time.
8         Q.  (BY MS. KENNEDY)  Well, you were just not
9   perceiving reality correctly.  Because, in fact, when you
10   shot him the first time, you hit him in the leg.  So if
11   you had assessed the situation, you would have been able
12   to see that you had hit Gage Lorentz in the leg.
13        MS. LYMAN:  Objection.  Form and foundation.
14        Q.  (BY MS. KENNEDY)  Wouldn't you agree based
15   on your body-worn camera footage?
16        A.  No.
17        Q.  Why not?
18        A.  Okay.  This is --
19        Q.  What facts do you have to support your
20   assertion that after you shot Gage the first time it hit
21   him in the leg?
22        MS. LYMAN:  Objection.  Form and foundation.
23        A.  I didn't see anything and I didn't feel like
24   he reacted.
25        Q.  (BY MS. KENNEDY)  Right.  Because what
```

Page 265

```
1   you're -- you're saying your memory tells you that what
2   you did was actually stand up, take steps back, and shoot
3   him because he stood up and was coming for you.  That's
4   what your mind remembers happened.  Right?
5         MS. LYMAN:  Objection.  Form and foundation.
6         Q.  (BY MS. KENNEDY)  Right?
7         A.  Yes.
8         Q.  Right.  So even though your counsel showed
9   you what really happened, your mind still believes that
10   Gage Lorentz stood up after the first shot and was coming
11   for you?
12        MS. LYMAN:  Objection.  Form and foundation.
13        A.  That is what I remember.
14        Q.  (BY MS. KENNEDY)  And is that what happens
15   in your dreams?
16        A.  Yes.
17        MS. KENNEDY:  Take a break now.
18        THE VIDEOGRAPHER:  The time is 4:07 p.m.
19   We're off the record.
20        (Break taken from 4:07 p.m. to 4:23 p.m.)
21        THE VIDEOGRAPHER:  The time is 4:23 p.m.
22   We're on the record.
23        Q.  (BY MS. KENNEDY)  Do you agree with me that
24   when you shot Gage Lorentz the first time, he was
25   unarmed?
```

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

Exhibit A

**Page 266**

1    MS. LYMAN: Objection. Form and foundation.
2         A. I never knew if he was armed or not.
3         Q. (BY MS. KENNEDY) Okay. Do you agree with
4    me that when you shot Gage Lorentz the first time, you
5    did not see anything that would indicate that he was
6    armed?
7         MS. LYMAN: Objection. Form and foundation.
8         A. No.
9         Q. (BY MS. KENNEDY) You don't agree -- agree
10   with me on that?
11        A. No.
12        Q. Why not?
13        A. I remember that he was trying to put his
14   hands in his pockets. And I had said something about not
15   putting your hands in your pockets.
16        Q. Okay. So because he didn't put his hands in
17   his pockets, you think that perhaps Gage Lorentz was
18   armed before you shot him?
19        MS. LYMAN: Objection. Form and foundation.
20        A. I thought that it was possible that he could
21   be armed.
22        Q. (BY MS. KENNEDY) Okay. You didn't see
23   anything in his pockets that would indicate to you that
24   he was armed.
25        MS. LYMAN: Objection. Form and foundation.

**Page 267**

1         A. No.
2         Q. (BY MS. KENNEDY) You didn't see anything in
3    his hands that would indicate to you that he was armed.
4         A. Correct.
5         Q. You didn't see anything on his body that
6    would indicate to you that he was armed.
7         MS. LYMAN: Objection. Form.
8         A. Well, I didn't have a complete look at his
9    body to know whether or not he had something.
10        Q. (BY MS. KENNEDY) Okay. So you saw the
11   front of his body. Right?
12        A. Yes.
13        Q. Nothing in the front of his body made you
14   think he was armed.
15        MS. LYMAN: Objection. Form.
16        A. Correct.
17        Q. (BY MS. KENNEDY) Okay. And you're saying
18   that you never saw the back side of his body?
19        A. Correct.
20        Q. So you never saw whether he was armed
21   because you never saw the back side of his body?
22        A. Correct.
23        Q. Nothing that you saw about his body would
24   indicate to you that he was armed.
25        MS. LYMAN: Objection. Form and foundation.

**Page 268**

1         A. Correct.
2         Q. (BY MS. KENNEDY) So when you say you didn't
3    know whether he was armed, it's because you never asked
4    him, "Are you armed?"
5         MS. LYMAN: Objection. Form and foundation.
6         A. I don't think I ever got that opportunity.
7         Q. (BY MS. KENNEDY) So when -- when you first
8    were talking to Gage during the 30-second buffer, you
9    didn't have an opportunity to say, "Sir, do you have any
10   weapons on you?"
11        A. I never did ask him that.
12        Q. But you had an opportunity to ask him that
13   when you first talked to him. Right?
14        MS. LYMAN: Objection. Form and foundation.
15        A. That's -- that wasn't the question that I
16   started with.
17        Q. (BY MS. KENNEDY) But you had an opportunity
18   to ask him, "Sir, do you have any weapons on you?"
19        A. I could have started with that, yes.
20        Q. Right. In fact, you could have asked him
21   whether he was armed before you asked him to turn around.
22   Right?
23        MS. LYMAN: Objection. Form and foundation.
24        Q. (BY MS. KENNEDY) I'm just trying to
25   understand when you testify under oath that you never had

**Page 269**

1    an opportunity to ask him whether his -- he was armed,
2    what is the basis of that assertion?
3         MS. LYMAN: Objection. Form.
4         A. I just never asked him.
5         Q. (BY MS. KENNEDY) Right. But you could have
6    asked him. Right?
7         A. Sure, I could have.
8         Q. So in fact, you did have an opportunity to
9    ask him whether he was armed.
10        A. Yeah, I could have.
11        Q. Right. And it's on you that you don't know
12   whether he's armed. Right?
13        MS. LYMAN: Objection. Form and foundation.
14        A. Right. But even if he said no, I'm not
15   going to take that.
16        Q. (BY MS. KENNEDY) Do you have any reason not
17   to believe him if you say, "Sir, Mr. Lorentz, you sure
18   were driving fast. What were you -- why were you" -- did
19   you ever ask him, "Sir, why were you driving so fast?"
20        A. No, I never asked him that.
21        Q. Did you ever ask him, "Sir, have you had
22   anything to drink?"
23        A. I didn't ask him that.
24        Q. Right. Did you ever ask him, "Sir, are you
25   having a hard day?"

68 (Pages 266 to 269)

Exhibit A

Page 270

1    A. I asked him if there was an emergency.
2    Q. Okay. When you asked him, "Is there an
3  emergency," what did he say?
4    A. I didn't get a response from him.
5    Q. Okay. No response at all?
6    A. No. I don't remember any response at all.
7    Q. Was -- when you asked him was there an
8  emergency, was that during the buffering period?
9    A. Probably. I don't remember when it comes
10  on.
11    Q. Okay. Okay. During the buffering period,
12  other than asking him -- and so when you said, "Is there
13  an emergency," he just ignored you?
14        MS. LYMAN: Objection. Form and foundation.
15    A. He had no response.
16    Q. (BY MS. KENNEDY) No response at all.
17    A. Correct.
18    Q. Okay. What else did you ask him where he
19  had no response?
20    A. The very first thing that I asked him, I
21  believe what I said was, "Talk to me and tell me what's
22  going on today." Those were my first words to him.
23    Q. So your first words to him were -- before
24  you said, "What is your name? How are you?" you said,
25  "Talk to me and tell me what's going on today"?

Page 271

1    A. Yes.
2    Q. So you ordered him, "Talk to me"?
3        MS. LYMAN: Objection. Form and foundation.
4    Q. (BY MS. KENNEDY) Is that how you talk to
5  people? Do you walk up to people you don't know and say,
6  "Talk to me"?
7        MS. LYMAN: Objection. Form.
8    A. Not normally.
9    Q. (BY MS. KENNEDY) Okay. So why did you walk
10  up to him and say, "Talk to me"?
11    A. "Talk to me and tell me what's going on
12  today."
13    Q. Is that -- is that how you said it to him?
14    A. That's an open-ended question and he could
15  have said anything.
16    Q. Okay. So is -- but does that -- do you go,
17  "Talk to me. Tell me what's going on today." Is that
18  the inflection you used when you talked to Gage Lorentz?
19    A. Yeah, probably.
20    Q. You don't remember specifically?
21    A. I wasn't angry. I wasn't accusatory --
22  accusing him of anything, and I just wanted him to have
23  an opportunity to talk.
24    Q. So when you walked up to him after you'd
25  seen him run into the -- you know, destroy the sign, you

Page 272

1  walk up to him and you say, "Talk to me. What's going on
2  today," how close were you to him at that point?
3    A. I was probably 7 to 10 feet.
4    Q. And how did he respond to that question?
5    A. He said, "Where is he?"
6    Q. Did you think it was an odd response to
7  "Talk to me. Tell me what's going on today," to say,
8  "Where is he"?
9        MS. LYMAN: Objection. Form.
10    A. Yes.
11    Q. (BY MS. KENNEDY) Were that -- were you
12  trained to recognize that a response like that could
13  indicate that someone was in the midst of a mental health
14  crisis?
15        MS. LYMAN: Objection. Form and foundation.
16    A. No.
17    Q. (BY MS. KENNEDY) Have you had any training
18  in crisis intervention training to recognize when someone
19  is in a mental health crisis?
20        MS. LYMAN: Objection. Foundation.
21    A. I have not had anything specific.
22    Q. (BY MS. KENNEDY) Ever?
23    A. No. We talked about dealing with -- when I
24  was at FLETC, we had a course on dealing with people with
25  mental illness, but --

Page 273

1    Q. Was that in 2005?
2    A. Yes.
3    Q. Okay. And when someone responds, "Where is
4  he" and you don't know who he's talking about or where
5  who might be, does it cause you to think that you might
6  be engaging with someone with a mental health disability
7  or someone who is in a mental health crisis?
8        MS. LYMAN: Objection. Form and foundation.
9    A. What I actually wondered was whether or not
10  he was using something.
11    Q. (BY MS. KENNEDY) So did you ask him, "Sir,
12  have you imbibed anything that would cause you to think
13  that someone's there that's not there?" Or why did you
14  think -- why did you think that because he said, "Where
15  is he," he had used drugs?
16        MS. LYMAN: Objection. Form and foundation.
17    A. I didn't think that he had used drugs. I
18  thought it was a possibility that he had used some drugs.
19        But that was my starting point. "Where is
20  he?" Well, where is who? Then I got no response. Maybe
21  he realized that response made no sense. I don't
22  know.
23    Q. (BY MS. KENNEDY) Okay. So did you say:
24  Sir, I don't know who you're talking about. What are you
25  talking about? How did that happen?

69 (Pages 270 to 273)

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

Exhibit A

Page 274

1    A. I just asked, "Where's who?" Then I got no
2  response. And I asked, "Is there some kind of an
3  emergency?"
4          And I thought that that was an important
5  question. Well, maybe, you know, if there -- if there
6  was an emergency, that would certainly explain the
7  speeding and the lack of paying attention.
8          Maybe there -- maybe there really was
9  something wrong, and that's where I wanted him to talk to
10  me.
11    Q. So did you ask him, "Sir, is there something
12  wrong?"
13    A. "Is there some kind of emergency?" I
14  remember asking him that.
15    Q. And he ignored you. And then what did you
16  ask next?
17    A. "Could you tell me your name?"
18    Q. And did he tell you his name?
19    A. He did not.
20    Q. And then what did you ask him next?
21    A. I -- I said something to the effect of, "If
22  you can't tell me your name, can you -- do you have any
23  identification with you?"
24    Q. What did he say to that?
25    A. He said, "Sure. It's in the truck. Why

Page 275

1  don't you go get it."
2    Q. Okay. And so, at that point, why didn't you
3  call for backup?
4    A. Okay. Again, I didn't really feel that
5  there was a need for backup. And even if I wanted
6  backup, my portable radio was unreliable for getting
7  backup.
8    Q. Why was your portable radio unreliable for
9  getting backup?
10    MS. LYMAN: Objection. Form and foundation.
11    A. It does not work appropriately in that
12  location.
13    Q. (BY MS. KENNEDY) How do you know your
14  portable radio doesn't work appropriately in that
15  location?
16    A. I've used it before.
17    Q. You've used the portable radio in that
18  location and it has failed to work. When you say it
19  doesn't work, how does it not work, to your knowledge?
20    A. It does not produce a strong enough signal
21  to reach out to the repeater.
22    Q. So you knew when you closed distance on Gage
23  and started this conversation, that you would have no way
24  to call for backup.
25    MS. LYMAN: Objection. Form and foundation.

Page 276

1    A. Yes.
2    Q. (BY MS. KENNEDY) Okay. So you knew as soon
3  as you left your vehicle and closed the distance between
4  you and Gage that you would have no ability, once you did
5  that, to call for backup without retreating to your
6  vehicle.
7    MS. LYMAN: Objection. Form and foundation.
8    A. Yes.
9    Q. (BY MS. KENNEDY) Do you agree with me that
10  when you shot Gage the first time, he did not have his
11  hands around or on your head?
12    MS. LYMAN: Objection. Form and foundation.
13    A. No. I think he did have them around my
14  head.
15    Q. (BY MS. KENNEDY) All right. So is that --
16    A. He had taken his hands off the weapon after
17  trying to disarm me.
18    Q. Okay. So when he -- when you -- okay. So
19  why do you think he was trying to disarm you?
20    A. To take my weapon?
21    Q. Yeah. Why do you -- why -- you keep saying
22  that you thought he was trying to take your weapon. But
23  he never took your weapon out of the holster, did he?
24    MS. LYMAN: Objection. Form.
25    A. No. He was trying to disarm me. He never

Page 277

1  successfully removed the weapon.
2    Q. (BY MS. KENNEDY) Right. He never -- he
3  never even -- he never even got his hands on the holster.
4  Right?
5    MS. LYMAN: Objection. Form and foundation.
6    A. Oh, but he did.
7    Q. (BY MS. KENNEDY) Oh, he did. He touched --
8  he touched your holster.
9    A. I felt his hands on my hand, and then I felt
10  him reach around on either side of my hands to attempt to
11  remove the weapon from the holster.
12    Q. Okay. How could he -- because I'm trying to
13  visualize here. If you have a holster and you have your
14  hand on top of the holster, how can someone get the
15  weapon out of the holster?
16    MS. LYMAN: Objection. Form and foundation.
17    Q. (BY MS. KENNEDY) It's locked inside.
18    A. Okay. The weapon itself is -- is larger
19  than my hand. And so I am -- I could feel him. He tried
20  to pull my hand away.
21          And then I felt him. He was trying to grab
22  the -- where the magazine bottom is and use that. And
23  then I could feel him coming in from the other side using
24  the second hand to try and get control of the holster.
25    Q. Okay. And you didn't tell anyone that

70 (Pages 274 to 277)

Exhibit A

Page 278

1    during your previous statements to law enforcement.
2    Right?
3            MS. LYMAN:  Objection.  Form and foundation.
4        A.  I don't know that we went into a lot of
5    detail on the attempt to disarm me.
6        Q.  (BY MS. KENNEDY)  Okay.  So your testimony
7    here under that oath is that Gage Lorentz attempted to
8    disarm you by getting the gun out of your holster.
9    Right?
10       A.  Yes.
11       Q.  Okay.  And you said under oath earlier that
12   Gage Lorentz stopped trying to get the gun out of your
13   holster and put his hands behind your head.  Correct?
14           MS. LYMAN:  Objection.  Form and foundation.
15       A.  I think he was just punching me in the head.
16       Q.  (BY MS. KENNEDY)  Okay.  So he never put his
17   hands on top of your head?
18           MS. LYMAN:  Objection.  Form and foundation.
19       A.  I think that was earlier.
20       Q.  (BY MS. KENNEDY)  Okay.  So when Gage
21   Lorentz stopped going for your weapon, where was his
22   hands?
23       A.  He was punching me in the head.
24       Q.  Okay.  So he was -- were you laying on the
25   ground at that time?

Page 279

1        A.  Yeah.  I was on my knees trying to get up.
2        Q.  Okay.  So you're on your knees.  You guys
3    had both fallen to the ground.
4            MS. LYMAN:  Objection.  Form and foundation.
5        A.  No.  He was on his feet.  I was on the
6    ground trying to get up.
7        Q.  (BY MS. KENNEDY)  Why did you fall to the
8    ground?
9        A.  He pushed me backwards after I attempted the
10   drive-stun.
11       Q.  Okay.  So after you attempted to drive stun
12   him, he pushed you and you fell on the ground?
13       A.  Yes.
14       Q.  Okay.  And at that point you got up on your
15   knees?
16       A.  Yes.
17       Q.  Okay.  And Gage is still standing over you
18   at that point?
19       A.  Yes.
20       Q.  At that point you do not draw the gun?
21       A.  Correct.
22       Q.  Okay.  At that point he hits you in the
23   face.
24       A.  He hit me in the face before he knocked me
25   on the ground, and then he started punching me in the

Page 280

1    face and head after I was --
2        Q.  How many times did you punch you in the face
3    and head?
4        A.  I don't know.
5        Q.  More than twice?
6        A.  Yes.
7        Q.  Where did the punches land on your face?
8        A.  Sort of on the cheek and around the temple
9    here.
10       Q.  Is that the only side of the face that he
11   hit is what you indicated there?
12       A.  Mostly what I remember is him hitting me
13   in the head.
14       Q.  Where in the head did he hit you?
15       A.  Right up here.
16       Q.  With his closed fist?
17           MS. LYMAN:  Objection.  Form and foundation.
18       A.  I'm not sure I could see whether or not his
19   fist was closed or not.
20       Q.  (BY MS. KENNEDY)  Well, did you feel like
21   you were being slapped or punched?
22       A.  I felt like I was being punched.
23       Q.  Okay.  And how many times did you feel Gage
24   Lorentz punch you before you drew your weapon?
25       A.  Well, he punched me several times and I

Page 281

1    don't know how many times.  Then he attempted to take the
2    weapon, and he leaned across me and used both hands to
3    try and take it.  I was holding it into the holster.  He
4    couldn't get it.  He went back to hitting me.  I drew the
5    weapon and delivered that first shot.
6        Q.  Okay.  So it's your testimony now here under
7    oath that you delivered the first shot into Gage Lorentz
8    when you were still on the ground?
9        A.  Yes.
10       Q.  Okay.  And that at the time that you drew
11   your weapon when you were still on the ground, Gage
12   Lorentz was hitting you in the head?
13       A.  Correct.
14       Q.  Okay.  At the time that Gage Lorentz was
15   hitting you in the head was he using deadly force?
16           MS. LYMAN:  Objection.  Form and foundation.
17       A.  Hitting me in the head, yeah.  Possibly.
18       Q.  (BY MS. KENNEDY)  Have you ever been --
19       A.  Any -- any one of those could have knocked
20   me out.
21       Q.  Okay.  So you were afraid when you were on
22   the ground that Gage Lorentz could hit you in the head
23   and knock you out?
24       A.  No.
25       Q.  No?

71 (Pages 278 to 281)

Exhibit A

Page 282

1    A.  No.  It was -- it was after he attempted to
2  take the weapon.
3        Q.  That he hit you in the head.  So hard that
4  you thought he might be able to knock you out?
5    A.  No.
6        MS. LYMAN:  Objection.  Form and foundation.
7        Q.  (BY MS. KENNEDY)  Okay.  I'm trying to
8  understand where he hit you --
9    A.  I think you're trying to make assertions
10  that aren't correct.
11        Q.  No, I'm not.  That's not true at all.  I'm
12  trying to understand what actually happened here.
13  You're -- I think you're projecting.  I think you're
14  accusing me of doing what you're doing, actually.
15        MS. LYMAN:  Objection.
16        Q.  (BY MS. KENNEDY)  What I'm trying to
17  understand from you -- and trying to get an answer
18  from -- is when you shot Gage Lorentz, where were his
19  hands?
20    A.  I think he was hitting me in the head with
21  his hands.
22        Q.  Okay.  And you say that he's punching you in
23  your head -- in -- on your head with his hands with his
24  right fist and it's hitting you on top of your head?
25        MS. LYMAN:  Objection.  Form and foundation.

Page 283

1    A.  Yeah, I think so.
2        Q.  (BY MS. KENNEDY)  But at no point when he
3  was hitting you on top of your head did you think that
4  you were going to knocked unconscious?
5    A.  I believe that it was possible I could be
6  knocked unconscious.
7        Q.  Okay.  So you thought maybe -- just like you
8  thought it was possible he could be armed, you thought
9  possibly he could knock you conscious, but you didn't
10  really have any evidence that he was knocking you
11  unconscious.
12        MS. LYMAN:  Objection.  Form and foundation.
13    A.  I have a suspect who's resisting and
14  fighting.  Once he'd knocked me on the ground, he had the
15  opportunity to run away.
16        Q.  (BY MS. KENNEDY)  Right.  He could have run
17  away at any time.  Right?
18    A.  Right.
19        Q.  And running away is not using deadly force,
20  you'd agree.  Right?
21    A.  Right.
22        Q.  Right.  Okay.  But what I'm trying to get to
23  is you were never -- did anyone ever tell you as a result
24  of Gage hitting you that you suffered a concussion?
25    A.  No.

Page 284

1        Q.  Okay.  So you know that you weren't hit hard
2  enough to suffer a concussion.  Right?
3    A.  Right.
4        Q.  So you certainly weren't hit hard enough to
5  be knocked unconscious.  Right?
6        MS. LYMAN:  Objection.  Form and foundation.
7        Q.  (BY MS. KENNEDY)  I'm just asking you if you
8  know the facts.
9    A.  Okay.  What would it take for him to knock
10  me unconscious?  He's already hitting me in the head.
11        Q.  (BY MS. KENNEDY)  I'm asking you whether you
12  ever told any medical personnel, "He hit me so hard that
13  I thought I could be knocked unconscious."  You never
14  told anyone that, did you?
15        MS. LYMAN:  Objection.  Form.
16    A.  I don't know what I discussed with the
17  doctor.
18        Q.  (BY MS. KENNEDY)  Okay.  You know now that
19  you never told anyone, "Oh, he was hitting me in the head
20  so hard that he could have knocked me unconscious."
21        MS. LYMAN:  Objection.  Form and foundation.
22        Q.  (BY MS. KENNEDY)  In fact, during your
23  interview with Detective Rostro, on page 31 of
24  Plaintiffs' Exhibit A, you stated that Mr. Lorentz was
25  hitting you but that it didn't hurt like you expected it

Page 285

1  to hurt.  Is that accurate?
2    A.  I do remember saying that.
3        Q.  Right.  If Mr. Lorentz was striking you and
4  it didn't hurt like you expected, why did you feel you
5  had to shoot him twice and kill him?
6        MS. LYMAN:  Objection.  Form and foundation.
7    A.  The shooting only took place after he
8  attempted to take my weapon.
9        Q.  (BY MS. KENNEDY)  Okay.  So since he had
10  attempted to take your weapon is why you shot him.
11    A.  Yes.
12        MS. LYMAN:  Objection.  Form and foundation.
13        Q.  (BY MS. KENNEDY)  And that's the only reason
14  you shot him was because he had attempt -- you allege he
15  had attempted to take your weapon and that is why you
16  shot him?
17    A.  If he had never attempted to take the
18  weapon, I believe there would have been no shooting.
19        Q.  Okay.  So the only reason you shot Gage
20  Lorentz is because you allege he attempted to take your
21  weapon.
22        MS. LYMAN:  Objection.  Form and foundation.
23    A.  Yes.
24        Q.  (BY MS. KENNEDY)  All right.  And what you
25  said -- what you said earlier was when you decided to

72  (Pages 282 to 285)

Exhibit A

Page 294

1  fuck, and you said it was unrehearsed?  I'm really
2  wondering why you're using profanity at this point.
3          MS. LYMAN:  Objection.  Form.
4      A.  I don't know why I said that either of those
5  times.
6      Q.  (BY MS. KENNEDY)  Okay.  Prior to the
7  audible saying fuck, fuck at 03 and 05 on this, had you
8  used profanity prior to this in your interaction with
9  Gage Lorentz?
10     A.  Not at all that I remember.
11     Q.  Okay.  So to the best of your recollection,
12 you said fuck while you were both on the ground with the
13 gun?
14     A.  Yes.
15     Q.  Okay.
16     A.  I remember that he used it with me when he
17 said, "I didn't know who those people are."
18     Q.  Okay.  So it was because he said, "I don't
19 know who the fuck those people are," you decided you
20 could use profanity too?  Or was that the only time Gage
21 used the F word?
22         MS. LYMAN:  Objection.  Form and foundation.
23     Q.  (BY MS. KENNEDY)  Why did you bring up that
24 Gage used the F word?
25     A.  I don't know.

Page 295

1      Q.  Certainly when he said, "I don't know who
2  the fuck those boys are," that wasn't any cause to use
3  deadly force, was it?
4          MS. LYMAN:  Objection.  Form and foundation.
5      A.  I don't think there was any thought in my
6  mind that I was using deadly force.
7      Q.  (BY MS. KENNEDY)  At that point you hadn't
8  decided to use deadly force.  Right?
9      A.  Correct.
10     Q.  And at that point when he says, "I don't
11 know who those boys are," that wasn't threatening to you,
12 was it?
13     A.  No.
14         (Video played.)
15     Q.  (BY MS. KENNEDY)  Okay.  At this point
16 you're telling Gage Lorentz that he's under arrest.
17 Correct?
18     A.  Yes.
19     Q.  At this point are you aware that you have
20 shot him twice?
21         MS. LYMAN:  Objection.  Form and foundation.
22     A.  I'm aware that I've shot him once.
23     Q.  (BY MS. KENNEDY)  Okay.  How are you aware
24 that you have shot him once?
25     A.  I saw his reaction as I was breaking away

Page 296

1  from him.
2      Q.  Okay.  I'm going to play that for you again.
3  Each time that you pull the trigger, do you say the word
4  fuck?
5          MS. LYMAN:  Objection.  Form and foundation.
6      A.  I don't know.
7      Q.  (BY MS. KENNEDY)  Let's watch it again.  So
8  this is the first.
9          (Video played.)
10     Q.  (BY MS. KENNEDY)  At this point when you're
11 telling him he's under arrest, do you perceive him still
12 to be a threat of great bodily harm or death?
13         MS. LYMAN:  Objection.  Form.
14     A.  No.
15     Q.  (BY MS. KENNEDY)  Okay.  So at this point
16 you can see that he's on the ground and he's unable to
17 take your weapon from you.  Correct?
18     A.  Yes.
19     Q.  And he's still unarmed.  Right?
20         MS. LYMAN:  Objection.  Form and foundation.
21     A.  Unknown to me.
22     Q.  (BY MS. KENNEDY)  Right.  But there's
23 nothing that indicates here so far that he has a weapon.
24 Like during the fight, he never pulled out a weapon.
25 Right?

Page 297

1      A.  Right.
2      Q.  And during the fight, he didn't say, "I've
3  got a knife my back pocket," right, pull it on you?
4      A.  He say anything like that.
5      Q.  Right.  He didn't pull out a firearm during
6  the fight.  Right?
7      A.  No.
8      Q.  So during the entire time that you're
9  fighting him he doesn't in any way -- he never introduces
10 a deadly weapon into the fight.  Right?
11         MS. LYMAN:  Objection.  Form and foundation.
12     A.  I disagree.  He attempted to take mine.
13     Q.  (BY MS. KENNEDY)  Okay.  But he didn't take
14 your weapon.  Correct?
15     A.  Correct.
16     Q.  And he never introduced a deadly weapon into
17 the fight, did he?
18         MS. LYMAN:  Objection.  Form.
19     A.  I would disagree.
20     Q.  (BY MS. KENNEDY)  Okay.  What deadly weapon
21 did he introduce into the fight?
22     A.  He attempted to take my weapon to introduce
23 it into the fight.
24     Q.  Right.  But he did not take your weapon.
25 Correct?

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

Exhibit A

Page 306

```
 1      A.  I -- I don't think I've seen those photos.
 2          (Exhibit H marked.)
 3          (Exhibit G marked.)
 4      Q.  (BY MS. KENNEDY)  Okay.  Those photos are
 5  marked as Plaintiffs' Exhibits H and G.  Is that your gun
 6  depicted on Plaintiffs' Exhibit H and G.  Yes?
 7      A.  G and H, yes.  That looks like the weapon I
 8  was carrying that day.
 9      Q.  Okay.  And do you see the scuff marks on --
10  depicted in the photos on each side of your gun?
11          MS. LYMAN:  Objection.  Form and foundation.
12      Q.  (BY MS. KENNEDY)  Do you agree that is
13  dirt or scuff marks, or do you think that that was
14  preexisting prior to your encounter with Gage Lorentz?
15      A.  I don't know.  I don't know if that's dirt
16  or not.
17      Q.  Right.  So sitting here today looking at the
18  slide that -- that Erik Westpfahl suggested to you shows
19  that Gage Lorentz almost got your gun, can you tell from
20  the slide whether your gun at this point is on the
21  ground?
22          MS. LYMAN:  Objection.  Form and foundation.
23      A.  To me it doesn't look like it's on the
24  ground.
25      Q.  (BY MS. KENNEDY)  So at this point Gage
```

Page 307

```
 1  doesn't have -- isn't pressing your gun into the ground?
 2      A.  I don't think so.
 3      Q.  But you can't tell, can you?
 4      A.  I can't.
 5      Q.  And you don't know whether Gage was trying
 6  to disarm you to prevent you from killing him?
 7          MS. LYMAN:  Objection.  Form and foundation.
 8      A.  I wouldn't know.
 9      Q.  (BY MS. KENNEDY)  And you don't know what
10  Gage -- Gage's intent was when he was trying to, as you
11  say, get the gun from you?
12          MS. LYMAN:  Objection.  Form and foundation.
13      A.  I think a reasonable officer would believe
14  that the weapon is going to be taken from them and used
15  against them.
16      Q.  (BY MS. KENNEDY)  Okay.  But Gage never
17  said, "I'm going to take your gun and use it against
18  you."
19      A.  No.
20      Q.  Right.  He never said, "I'm going to kill
21  you."
22      A.  No.
23      Q.  He never threatened you verbally in any way?
24          MS. LYMAN:  Objection.  Form and foundation.
25      A.  I disagree.
```

Page 308

```
 1      Q.  (BY MS. KENNEDY)  Okay.  He never threatened
 2  you verbally.  Well, what?  What did he say that you
 3  perceived to be a threat?
 4      A.  That whole comment about, "No, the other
 5  one."
 6      Q.  Okay.  So when Gage said, when you -- you're
 7  the one who pulled the Taser on Gage while he was
 8  standing in the street.  Correct?
 9          MS. LYMAN:  Objection.  Form.
10      Q.  (BY MS. KENNEDY)  Right?  You pulled the
11  Taser on Gage when he was standing there in the street.
12      A.  I -- I removed it from its holster.
13      Q.  And you kept it in low-ready position or had
14  you started to bring it up?
15          MS. LYMAN:  Objection.  Form and foundation.
16      A.  At that point it's what's call the display.
17  It's been removed from the holster but it's not been
18  pointed at the suspect.
19      Q.  (BY MS. KENNEDY)  Right.  Did you -- when
20  you removed your Taser from the holster, is that when
21  Gage said, "You're going to have to use the other one"?
22      A.  Yes.
23      Q.  Okay.  And you perceived that to be a
24  threat?
25      A.  It is a threat.  Yes.
```

Page 309

```
 1      Q.  Why is it a threat?
 2      A.  Okay.  He's already trying to escalate that
 3  to deadly force.
 4      Q.  Oh, really?  Why?  Just -- why did you say
 5  -- how do you know he was just joking, like, "Hey.
 6  You're going to have to use the other one."
 7          MS. LYMAN:  Objection.  Form and foundation.
 8      Q.  (BY MS. KENNEDY)  Like, "Come on, big man.
 9  You're threatening me.  You're going to have to use the
10  other one."
11          MS. LYMAN:  Objection.  Form and foundation.
12      Q.  (BY MS. KENNEDY)  I mean, how do you know
13  he's not just flicking you some shit?
14          MS. LYMAN:  Objection.  Form and foundation.
15      A.  Okay.  Didn't -- didn't sound like anything
16  other than a threat to me.
17      Q.  (BY MS. KENNEDY)  Okay.  Has anyone ever
18  flicked you shit before when you've been a cop?
19          MS. LYMAN:  Objection.  Form and foundation.
20      A.  Yes.
21      Q.  (BY MS. KENNEDY)  Right.  Say things like,
22  "Come on, big man.  Why don't you take me."  Has anyone
23  said anything like that to you?
24          MS. LYMAN:  Objection.  Form and foundation.
25      A.  That's pretty rare.
```

78 (Pages 306 to 309)

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

Exhibit A

Page 314

1    Q.  (BY MS. KENNEDY)  So after he spoke those
2  words, you were ready to use deadly force against Gage
3  Lorentz.
4    A.  No.
5      MS. LYMAN:  Objection.  Form and foundation.
6    Q.  (BY MS. KENNEDY)  You were ready to close
7  distance on him and incapacitate him after he said those
8  words.
9      MS. LYMAN:  Objection.  Form and foundation.
10    A.  I gave him an opportunity.  I said to him,
11  "I've told you to turn around and put your hands behind
12  your back.  Are you going to do it or not?"
13    Q.  (BY MS. KENNEDY)  Oh.  Oh, that's what --
14  that's what the video shows you said?
15      MS. LYMAN:  Objection.  Form and foundation.
16    A.  That's what I remember saying.
17    Q.  (BY MS. KENNEDY)  Right.  But we know that
18  your memory is not accurate, right, from watching the
19  other video?
20      MS. LYMAN:  Objection.  Form and foundation.
21    A.  Well, I don't get everything wrong all the
22  time.
23    Q.  (BY MS. KENNEDY)  Right.  And it's important
24  when you take a human life not to get everything wrong,
25  isn't it?

Page 315

1      MS. LYMAN:  Objection.  Form and foundation.
2    Q.  (BY MS. KENNEDY)  How can you trust your
3  memory when you didn't accurately inform the officers as
4  to how you shot and killed Gage Lorentz?
5      MS. LYMAN:  Objection.  Form and foundation.
6    Q.  (BY MS. KENNEDY)  If you don't know how you
7  took a human life, how can you trust your memory on
8  anything?
9      MS. LYMAN:  Objection.  Form and foundation.
10    Q.  (BY MS. KENNEDY)  You can answer the
11  question.
12    A.  Okay.  Which question did you want me to
13  answer?
14    Q.  The last question.
15    A.  Okay.
16      THE WITNESS:  Can you read that back to me,
17  please.
18      (Requested portion was read.)
19    A.  No.  I do know that I took his life by
20  shooting him.
21    Q.  (BY MS. KENNEDY)  But you don't know -- I
22  mean, when you walked around, you said you didn't know.
23  You thought you had shot him.  You didn't know whether
24  you'd hit him, and that you stood up, took three steps
25  back, and shot him again.  And you know sitting here now

Page 316

1  that that's a completely false memory.  Right?
2      MS. LYMAN:  Objection.  Form and foundation.
3    A.  Okay.  I think -- I think you're trying to
4  confuse me here.  So I know that I delivered a first shot
5  that I thought was unsuccessful.  And then I shot him a
6  second time.
7    Q.  (BY MS. KENNEDY)  Well, you know what you
8  said because we have a video of the walkthrough of what
9  you said.  Right?
10      What did you say?  What did you tell the
11  officers?  What did you believe happened before you were
12  presented with your own body-worn camera footage?
13      MS. LYMAN:  Objection.  Form and foundation.
14    A.  Okay.  I believed that I had delivered one
15  shot that was unsuccessful in subduing him and I
16  delivered a second shot that incapacitated him.
17    Q.  (BY MS. KENNEDY)  And you believed that you
18  had stood up, walked backwards, and shot him a second
19  time; and you believed that Gage Lorentz was coming for
20  you when you delivered a second shot, that he was
21  standing up.  That's what you told the officers during
22  the walkthrough.  Correct?
23    A.  I don't remember --
24      MS. LYMAN:  Objection.  Form and foundation.
25    A.  I don't remember him ever saying -- me ever

Page 317

1  saying that he was coming back at me.
2    Q.  (BY MS. KENNEDY)  Okay.  Sitting here today
3  you don't remember that that's what you told --
4    A.  Correct.
5    Q.  Okay.
6      (Video played.)
7    Q.  (BY MS. KENNEDY)  Why did you say fuck,
8  then?  Why did you scream fuck at that point?  Do you
9  know?
10    A.  No, I don't.
11    Q.  Okay.  And that was --
12      MS. KENNEDY:  I'm going to go off the
13  record.  It's 5:15.  And I'm going to consult with my
14  co-counsel and find out how much more time I have in this
15  deposition.
16      THE VIDEOGRAPHER:  The time is 5:14 p.m.  We
17  are off the record.
18      (Break taken from 5:14 p.m. to 5:26 p.m.)
19      THE VIDEOGRAPHER:  The time is 5:26 p.m.  We
20  are on the record.
21    Q.  (BY MS. KENNEDY)  Did you ever search Gage
22  Lorentz for weapons?
23    A.  I patted him down when I handcuffed him.
24    Q.  Where did you pat him down when you
25  handcuffed him?

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

Exhibit A

Page 318

1    A. Just the area accessible to his hands.
2    Q. So did you consider a pat-down of the area
3  accessible to his hands a search for weapons?
4        MS. LYMAN: Objection. Form and foundation.
5    A. Yeah.
6    Q. (BY MS. KENNEDY) Did you check his back
7  pockets for weapons?
8    A. I don't remember checking his back pockets.
9    Q. Well, you said you could see the front of
10  his body and you could never see the back of his body.
11  So did you ever clear the back of his body
12  to see whether he had any weapons in his back pockets?
13        MS. LYMAN: Objection. Form and foundation.
14    A. I don't remember checking his back pockets.
15    Q. (BY MS. KENNEDY) For weapons?
16    A. For weapons.
17    Q. Right. Did you -- did you check his front
18  pockets for weapons?
19    A. No. Once he was handcuffed, that was not
20  accessible to his hands.
21    Q. Okay. So when you say you patted him down,
22  what area of his body did you pat down?
23    A. Okay. Just along the -- the belt line there
24  when I -- when I -- because the first hand I did out --
25  out, like this (indicating).

Page 319

1        And then I brought it around and brought the
2  other hand up and secured it and patted that area. And
3  that would just be consistent with my training.
4    Q. So you're testifying to that because it's
5  consistent with your training to check around the --
6  someone's waist for weapons? Is that what you did? You
7  slide your hand around his waist?
8    A. Yeah. Just -- if you -- if you can just get
9  a sense of something, you know, without being intrusive.
10  Okay. It's possible you could miss something.
11    Q. So you didn't find any weapons when you put
12  your hand across Gage's waist?
13    A. No, I don't remember that. That I -- no, I
14  didn't remember finding anything.
15    Q. Right. And you know that you didn't find
16  anything. Right?
17    A. Correct.
18    Q. Okay. Pursuant to National Park Service
19  policy what level of resistance must a suspect display to
20  justify the use of a Taser?
21    A. Okay. It could be used when a suspect is
22  actively resisting.
23    Q. Do you have training when describing a
24  suspect's resistance to categorize the resistance by the
25  level of physical resistance such as passive, active, or

Page 320

1  assaultive?
2        MS. LYMAN: Objection. Form and foundation.
3    A. No. We've never broken it down like that.
4    Q. (BY MS. KENNEDY) Okay. Have you ever heard
5  the term passively noncompliant?
6        MS. LYMAN: Objection. Foundation.
7    A. I have heard that term.
8    Q. (BY MS. KENNEDY) Who has introduced the
9  term passively noncompliant to you?
10    A. I think it's come up at FLETC.
11    Q. So in 2005 or later in your training?
12    A. 2005 I'm sure that it was discussed.
13    Q. What does passive compliance mean?
14    A. Passive compliance?
15    Q. Right.
16        UNIDENTIFIED SPEAKER: Passive
17  noncompliance.
18    Q. (BY MS. KENNEDY) I'm sorry. What did
19  passive not -- what does passive noncompliance mean?
20    A. Okay. It just means that they're -- they're
21  refusing to cooperate.
22    Q. So you would agree that passive
23  noncompliance means he did not follow your commands but
24  that he did not physically close distance or physically
25  threaten you.

Page 321

1        MS. LYMAN: Objection. Form and foundation.
2    A. Okay. We've established that he did not
3  follow any of my commands. He --
4    Q. (BY MS. KENNEDY) Okay. I'm going to stop
5  you there. But he did not follow your command to turn
6  around. Correct?
7    A. Correct.
8    Q. All right. When he did not follow your
9  command to turn around, did you believe at that point you
10  could use your Taser on him?
11    A. No.
12    Q. Okay. And at the time that he did not turn
13  around, he did not close distance on you, did he?
14        MS. LYMAN: Objection. Form and foundation.
15    A. No.
16    Q. (BY MS. KENNEDY) And at the time that he
17  did not turn around, he did not physically threaten you,
18  did he?
19    A. He made the comment about, "No, the other
20  one."
21    Q. Okay. So he did that before you ordered him
22  to turn around. Right?
23    A. I had ordered him to turn around I believe
24  twice and he refused. And I drew the Taser and had it --
25  had a display. He said, "No, the other one."

81 (Pages 318 to 321)

Exhibit A

Page 322

1    I asked him, "What?"
2    He said, "No.  The other one.  Get real with
3  me."
4        Q.  So have you watched the video on one of the
5  breaks during the deposition?
6        A.  No.
7        Q.  Okay.  So this is from your memory?
8        A.  Yes.
9        Q.  Okay.  You watched the video of your
10  interaction with Gage Lorentz on Sunday.  Correct?
11        A.  Yes.
12        Q.  Okay.  And that's the last time you saw the
13  video?
14        A.  Correct.
15        Q.  Right.  So you're testifying based on
16  reviewing the video.  Right?
17        A.  Yeah.  I remember -- I remember telling him
18  to, "Turn around and put your hands behind your back" a
19  couple of times.
20        And then I remember when I said, "I've told
21  you to turn around and put your hands behind your back.
22  Are you going to do it or not."
23        "No."
24        Q.  So -- so after you pulled out your Taser is
25  when he said, "You're going to have to use the other

Page 323

1  one."  Right?
2        A.  Yes.
3        Q.  And those words, you thought, indicated
4  something beyond passive noncompliance?
5        MS. LYMAN:  Objection.  Form and foundation.
6        A.  No.  What it indicated to me was that he
7  intended to escalate the matter.
8        Q.  (BY MS. KENNEDY)  Okay.  Why?  Why did the
9  words, "You're going to have to use the other one"
10  indicate that he sometime in the future might -- I mean,
11  how did those words indicate to you that he would
12  escalate the matter?
13        MS. LYMAN:  Objection.  Form.
14        A.  I don't think that that's a reasonable
15  response from somebody who is joking around.
16        Q.  (BY MS. KENNEDY)  Okay.  So you didn't ask
17  him, "Hey.  What did you mean by that?  Why did you say
18  that?"
19        A.  I did ask him.  I asked him to repeat that
20  for me.
21        Q.  And did he -- you did?  You said, "Repeat
22  that for me"?
23        A.  I just said, "What?"
24        Q.  Okay.  Did you say -- did you say -- since
25  you didn't know his name, did you say, "What do you mean

Page 324

1  by I'm going to have to use the other one?"
2        MS. LYMAN:  Objection.  Form.
3        A.  No, I didn't ask him.
4        Q.  (BY MS. KENNEDY)  Did you ask him, "Why did
5  you say that?  What a strange thing to say"?
6        A.  No, I didn't.
7        MS. LYMAN:  Objection.  Form.
8        Q.  (BY MS. KENNEDY)  Why not?
9        A.  To me that's a serious threat.  He's telling
10  me that he wants to escalate this to the need for a
11  firearm.
12        Q.  So at that time you didn't ask him to
13  determine whether it was a threat.  You agree that you
14  failed to ask him to determine what his words meant.
15        MS. LYMAN:  Objection.  Form.
16        A.  I didn't feel a need to ask him what his
17  words meant.
18        Q.  (BY MS. KENNEDY)  Why not?
19        A.  That's -- that's not a conversation I want
20  to have with somebody who's -- who's not following lawful
21  commands.
22        Q.  Why not?  Why -- why weren't you trained to
23  use language at that point to de-escalate the situation
24  by saying, "Sir, what do you mean when you say I'm going
25  to have to use the other one?  I don't want to use any

Page 325

1  force here, sir.  What's going on"?
2        MS. LYMAN:  Objection.  Form and foundation.
3        Q.  (BY MS. KENNEDY)  Why couldn't you engage
4  him in de-escalation communication at that point?
5        A.  He -- he's made it clear to me that he's not
6  willing to cooperate, and I don't think that he's going
7  to change anything.
8        Q.  So if you hadn't had used the Taser, he
9  wouldn't have changed anything?
10        MS. LYMAN:  Objection.  Form and foundation.
11        Q.  (BY MS. KENNEDY)  He just would have stood
12  there saying things like, "You're going to have to use
13  the other one"?
14        A.  No.  I think he was prepared to go after the
15  other one.
16        Q.  Okay.  I'm going to direct your attention to
17  Plaintiffs' Exhibit T that's in your notebook there.
18        (Exhibit T marked.)
19        MS. LYMAN:  It's the last tab.
20        Q.  (BY MS. KENNEDY)  When you deployed the
21  Taser, how many times did you pull the trigger?
22        A.  Two, I think.
23        Q.  Why do you think you only pulled the trigger
24  two times when you deployed the Taser?
25        MS. LYMAN:  Objection.  Form.

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

Exhibit A

Page 326

1    A. Okay. I believed that I deployed each of
2  the two cartridges unsuccessfully.
3    Q. (BY MS. KENNEDY) Okay. And you pulled the
4  trigger twice. Did you reassess each time you pulled the
5  trigger of the Taser?
6    A. Yes. I noticed that nothing happened.
7    Q. Okay. So you pulled the trigger of the
8  Taser once; you noticed that nothing happened. Gage,
9  even though you had Tased him, just continued to stand
10  there. Correct?
11    A. Yes.
12      MS. LYMAN: Objection. Form and foundation.
13    Q. (BY MS. KENNEDY) At that point did you
14  reassess the threat you were under when after being Tased
15  he just stood there?
16      MS. LYMAN: Objection. Form and foundation.
17    Q. (BY MS. KENNEDY) Did you reassess the
18  threat at that point?
19    A. Yeah.
20    Q. How many seconds passed between the first
21  time and the second time you pulled the Taser?
22    A. Probably five seconds.
23    Q. Oh, okay. And in that five seconds what
24  happened?
25    A. I don't remember anything.

Page 327

1    Q. Right. Gage just stood there for the five
2  seconds that you continued to -- so nothing had changed
3  because he'd spoken those words. Is that what you were
4  thinking?
5      MS. LYMAN: Objection. Form and foundation.
6    Q. (BY MS. KENNEDY) And even though you Tased
7  him, he just stood there. Right?
8    A. That's what I remember.
9    Q. Okay. And so, in light of the fact that he
10  didn't escalate the situation, he just stood there, you
11  reassessed. What in your reassessment at that point
12  caused you to pull -- pull the trigger a second time?
13      MS. LYMAN: Objection. Form and foundation.
14    A. That there was no effect from the first
15  Taser cartridge deployment.
16    Q. (BY MS. KENNEDY) Okay. So you saw that
17  Tasing -- pulling the Taser once didn't do anything. And
18  you pulled the Taser trigger again and it didn't do
19  anything again. Correct?
20    A. Yes.
21    Q. And after that, how many times did you pull
22  the trigger on the Taser?
23    A. I don't remember pulling it again.
24      MS. LYMAN: Objection. Form and foundation.
25    Q. (BY MS. KENNEDY) Okay. So it's your

Page 328

1  testimony under oath that you don't have any memory of
2  pulling the trigger on the Taser after the first two
3  cartridges came out?
4    A. Correct.
5    Q. Okay. So on the first page of Plaintiffs'
6  Exhibit T there is a still from your body-worn camera.
7  And there is a note from transcript at line 1545: So I
8  kept the Taser out he and he just stared at me, fists
9  clenched, looking at me. And just like I was taught
10  at -- F-l-e-t-c -- how do you say that?
11    A. FLETC.
12    Q. -- FLETC, you know, if you have pre-assault
13  indicators, don't wait around to get assaulted. Take the
14  fight to them.
15      So at that point, this is the last frame
16  before you -- what pre-assaultive behaviors do you see
17  depicted in this still?
18    A. Okay. We had -- we had the verbal comment,
19  okay. And then now we have him standing there. Now he
20  has his hands at his side. Okay. And he had -- I had
21  told him several times to take his hands out of his
22  pockets.
23    Q. Okay. On the second page, 2, it says: So I
24  deployed the Taser. And I did see one barb go into him,
25  but he just stood there. And I went in for a drive-stun,

Page 329

1  but no effect.
2      So this still that is under the still of the
3  hand here, is that your two arms as you're pointing the
4  Taser at Gage Lorentz?
5      MS. LYMAN: Objection. Form and foundation.
6    Q. (BY MS. KENNEDY) Depicted on Axon body
7  camera 2, the still at 9 minutes, 17 seconds?
8    A. You're talking about the second photo on the
9  lower one?
10    Q. Yes.
11    A. Okay.
12    Q. I'm sorry. That was incorrectly done. The
13  first photo on top is out of sequence. But the second
14  photo on the bottom, does that depict you pointing the
15  Taser at Gage Lorentz?
16    A. It appears so, but I can't -- I can't see
17  him.
18    Q. You can't see him under your watch?
19    A. Okay. Yeah. I see that there's a person
20  there.
21    Q. And so can you see now, can you deduce, from
22  your knowledge of the incident and your review of the
23  body-worn camera, that you were pointing your Taser at
24  Gage Lorentz?
25    A. Yes.

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

Exhibit A

Page 346

1 Exhibit S. What does that depict?
2    A. It looks like a beer can.
3    Q. How did that beer can get into your vehicle?
4    A. I'm sure that I picked it up while I was
5 picking up litter.
6        MS. KENNEDY: All right. Well, I will go
7 off the record and see if there's any brief follow-up
8 questions. If not, do you have any questions?
9        MR. ORTEGA: Give us a second.
10        THE VIDEOGRAPHER: The time is 5:58 p.m. We
11 are off the record.
12        (Break taken from 5:58 p.m. to 6:07 p.m.)
13        THE VIDEOGRAPHER: The time is 6:07 p.m. We
14 are on the record.
15    Q. (BY MS. KENNEDY) Ranger Mitchell, were you
16 confident that you could keep control of your handgun
17 when you pulled it from your holster?
18        MS. LYMAN: Objection. Form and foundation.
19    A. Yes.
20    Q. (BY MS. KENNEDY) Why were you confident
21 that you could keep control of your handgun when you
22 pulled it from the holster?
23    A. Because of my training.
24    Q. What training made you confident that you
25 could keep control of your handgun when you pulled it

Page 347

1 from the holster?
2    A. My training with the National Park Service
3 at the Federal Law Enforcement Training Center.
4    Q. But what training specifically? What
5 training told you that you could keep control of your
6 handgun when you pulled it from the holster when you were
7 involved in a on-the-ground fight with Gage Lorentz?
8        MS. LYMAN: Objection. Form and foundation.
9    A. My defensive tactics training at the Federal
10 Law Enforcement Training Center.
11    Q. (BY MS. KENNEDY) What in your defensive
12 tactics training at the Federal Law Enforcement Training
13 Center made you confident that you could keep control of
14 your handgun when you pulled it from the holster?
15        MS. LYMAN: Objection. Form and foundation.
16    A. The weapons retention training.
17    Q. (BY MS. KENNEDY) And what about your
18 weapons retention training made you confident that you
19 could keep control of your handgun when you pulled it
20 from the holster?
21        MS. LYMAN: Objection. Form and foundation.
22    A. The training -- the training was devised so
23 that you could use a firearm with -- with confidence.
24    Q. (BY MS. KENNEDY) What did they actually
25 teach or say that made you think that you could keep

Page 348

1 control of your handgun when you pulled it out from the
2 holster when you were with Gage Lorentz?
3        MS. LYMAN: Objection. Form and foundation.
4    Q. (BY MS. KENNEDY) What in your training made
5 you do that, that they said to you, "I'm in the middle of
6 a on-the-ground fight with a suspect."
7        What in the training told you that you could
8 keep control of your handgun when you pulled it out from
9 the holster?
10        MS. LYMAN: Objection. Form and foundation.
11    A. I'm not sure that there's any specific
12 training. The training is designed to instill confidence
13 in the officer.
14    Q. (BY MS. KENNEDY) So you were just confident
15 in everything that you did on that day based on your
16 training; it just made you confident that you could pull
17 out a gun when you were on the ground with a suspect from
18 the holster and keep control of it?
19        MS. LYMAN: Objection. Form and foundation.
20    A. I am -- I am confident that I acted in
21 accordance with my training that day.
22        MS. KENNEDY: Okay. Pass the witness.
23                * * *
24              EXAMINATION
25 BY MS. LYMAN:

Page 349

1    Q. Mr. Mitchell, I just want to ask you a few
2 follow-up questions just so that we can make sure that we
3 understand everything properly.
4        How long did your interaction with Gage last
5 in your estimation between the time you exited your
6 vehicle to the time you fired that second shot?
7    A. I would say approximately two and a half to
8 three minutes.
9    Q. And how much time would you say elapsed
10 between when you fired your Taser at Mr. Lorentz and when
11 you fired that second shot?
12    A. 25 to 30 seconds would be my guess.
13    Q. And how much time would you say elapsed
14 between when the drive-stun failed and when you fired
15 that second shot?
16    A. Perhaps 15 seconds.
17    Q. Is it fair to say, then, that the
18 altercation with Mr. Lorentz when it became physical
19 lasted just a matter of seconds?
20        MS. KENNEDY: Objection as to form and
21 foundation.
22    Q. (BY MS. LYMAN) You can answer.
23    A. Okay. The question again.
24    Q. Would it be fair to say that the altercation
25 with Mr. Lorentz when it became physical, hand to hand,

88 (Pages 346 to 349)

Exhibit A