

**National Park Service**
U.S. Department of the Interior

*National Park Service*

# LAW
# ENFORCEMENT
# PROGRAM

# REFERENCE MANUAL - 9

Approved:

_____ March 2015

Cameron H. Sholly

Associate Director, Visitor and Resource Protection

## 2015

Law Enforcement, Security, and
Emergency Services

CONFIDENTIAL

Exhibit A
Beck_20cv1280: USA_001482



# Law Enforcement Program

1. BACKGROUND AND OBJECTIVES
2. DEFINITIONS
3. POLICY
4. LAW ENFORCEMENT NEEDS ASSESSMENT
5. ROLE AND FUNCTIONS
6. SUPERVISION

APPENDIX 1-A. NPS HEADQUARTERS ORGANIZATION CHART

APPENDIX 1-B. LAW ENFORCEMENT, SECURITY, AND EMERGENCY SERVICES ORGANIZATION CHART

1. BACKGROUND AND OBJECTIVES

Reference Manual 9 (RM-9) applies to all employees involved in the National Park Service (NPS) law enforcement program, except the US Park Police (USPP), who are covered by General Orders.

The Act of Congress (commonly known as the Organic Act) establishing the National Park Service directs the Service to "…promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wildlife in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wildlife in such manner and by such means as will leave them unimpaired for the enjoyment of future generations" *54 U.S.C. 100101*.

To fulfill its congressional mission and mandate, the NPS will strive to administer areas under its care in such manner that they are free of criminal activity that threatens or compromises the ecological health and integrity of protected natural and cultural resources and/or disrupts an atmosphere conducive to public safety and enjoyment.



# Use Of Force

1. USE OF FORCE POLICY
2. DEFINITIONS
3. PRIMARY CONSIDERATION
4. USE OF INTERMEDIATE DEFENSIVE EQUIPMENT
5. REPORTING, SUPERVISORY REVIEW, AND INVESTIGATION
6. EXCESSIVE FORCE

1. **USE OF FORCE POLICY**

   Commissioned law enforcement personnel are authorized to use a wide variety of defensive equipment and force options in response to various threats and other enforcement situations. These options are provided in order to permit commissioned officers to select the defensive equipment or tactics that are most appropriate for the circumstances. The ability to transition from one type of force to another and stop the use of force is critical.

2. **DEFINITIONS**

   The following definitions apply to this and other chapters of this manual.

   2.1 **Deadly Force**

   Deadly force is the use of any force (with or without firearms) that is likely to cause death or serious physical injury. Deadly force does not include force that is not likely to cause death or serious physical injury but unexpectedly results in such death or injury.

Use Of Force – Ch. 10

2.2 **Discharge**

Pulling the trigger of a firearm or ECD, intentionally or unintentionally, and expelling a round or probes.

2.3 **Display**

The term "display" means the removal of a weapon from its holster, case, locking mount, or other normally stored location or position in anticipation of its use in a potential conflict. Weapons used in Patrol Carry are not considered a "display" unless the weapons is discharged, pointed, or used.

2.4 **Intermediate Weapons**

Intermediate weapons are weapons that are approved by the NPS that are intended to be unlikely to kill or cause great bodily harm. This includes firearms with less-lethal munitions.

2.5 **Objective Reasonableness**

The facts and circumstances, including the reasonable inferences drawn therefrom, known to a commissioned employee at the time of the use of deadly or other force that would cause a reasonable officer to conclude that the use of force used by the commissioned officer was reasonable based on the totality of circumstances known to the commissioned employee at the point in time the force was used. The reasonableness of a belief or decision must be viewed from the perspective of the commissioned officer on the scene, who may often be forced to make split-second decisions in circumstances that are tense, unpredictable, and rapidly evolving. As such, the Supreme Court has stated that objective reasonableness "is not capable of precise definition or mechanical application." In the context of this section, reasonableness will not be viewed from the calm vantage point of hindsight.

2.6 **Patrol Carry**

Regular patrol details, including poaching patrols and border patrols, that commonly require the carrying of long guns in addition to sidearms. These regular patrols will not require use of force reporting if the long guns are not discharged, pointed, or used.

2.7 **Physical Control Techniques**

Physical Control Techniques include methods such as come-a-longs, touch pressure points, personal weapons (hands, feet, etc.), and the application of restraints.

2.8 **Pointing**

The directing of the barrel of the firearm or ECD in such a manner that a discharge would likely impact a targeted individual, animal, or object.

2.9 **Use of Force**

For purposes of this chapter, the term "use of force" is intended to address the physical application of force, as opposed to mere officer presence or verbal commands. The use of force may range from physical controls, through intermediate/less-lethal weapons, to deadly force.

All incidents involving the **intentional** discharge of a firearm by commissioned employees, either on duty or off duty, are considered use of force, with the following exceptions:

- Training where no injury occurs.
- Authorized destruction of animals or other resource management activities.
- Legal recreational activities, such as hunting or sport shooting, where there is no human injury involved.

For reporting purposes, all incidents involving the **unintentional** discharge of a firearm (either on duty or off duty) are considered uses of force.

3. **PRIMARY CONSIDERATION**

The primary consideration in the use of force for commissioned employees is the timely and effective application of an objectively reasonable level of force required to establish and maintain lawful control. Commissioned employees are authorized to use a wide

CONFIDENTIAL    Exhibit A
Beck_20cv1280: USA_001584

variety of defensive equipment and force options in response to various threats and other enforcement situations. These options are provided in order to permit commissioned officers to select the defensive equipment or tactics, so long as they are objectively reasonable based upon the totality of the circumstances.

### 3.1 Use of Force

Other than deadly force is any type or level of force that does not create a significant risk of death.

Justifications for the use of force may include:

- To defend self.
- To defend others.
- To effect an arrest or investigatory Terry stop when lesser force is or would be insufficient.
- To restrain or control violent, threatening, or resistive behavior.
- To disperse an unlawful group.
- To prevent prisoner escape.
- To stop a riot/civil unrest.
- To defend property.
- To prevent destruction of evidence.
- Other circumstances when objectively reasonable.

### 3.2 Use of Deadly Force

Commissioned employees may use deadly force only when the employee has an objectively reasonable belief, in light of the facts and circumstances confronting the employee, that the subject of such force poses an immediate danger of death or serious physical injury to the employee or to another person.

### 3.3 Fleeing Subject

Deadly force may not be used solely to prevent the escape of a fleeing suspect. Deadly force may be used to prevent the escape of a fleeing subject if there is probable cause to believe:

- The subject has committed a crime involving the infliction or threatened infliction of serious physical injury or death,

    and

- The escape of the subject would pose an immediate danger of death or serious physical injury to the commissioned employee or to another person.

### 3.4 Verbal Warnings

If feasible, and if to do so would not increase the danger to the commissioned employee or others, a verbal warning to submit to the authority of the employee should be given prior to the use of deadly force.

### 3.5 Warning Shots

Warning shots are not permitted.

### 3.6 Vehicles

Firing at or from a moving vehicle is prohibited except in self-defense or in defense of others.

Weapons may be fired at the driver or other occupant of a moving vehicle only when:

- The commissioned employee has a reasonable belief that the subject poses an immediate danger of death or serious physical injury to the commissioned employee or to another person,

    and

- The public safety benefits of using such force outweigh the risks to the safety of the commissioned employee or other persons.

CONFIDENTIAL
Exhibit A
Beck_20cv1280: USA_001585

**32**

# Electronic Control Device (ECD) Program

1. PURPOSE
2. DEFINITIONS
3. POLICY
4. STANDARDS

---

## 1. PURPOSE

This chapter establishes NPS policy concerning use of Electronic Control Devices (ECDs) by commissioned employees.

The SLEO with ECD programs will appoint a commissioned employee to oversee the ECD program. This commissioned employee will maintain records on ECDs and cartridges issued, to include serial numbers and commissioned employees that ECDs are issued to, damaged ECDs or cartridges, annual training and certification, annual ECD inspections, and unintentional discharges.

## 2. DEFINITIONS

The following definitions apply to this and other chapters of this manual.

### 2.1 Deployment

Any instance of a trigger pull on an ECD, regardless of intention, is considered a deployment. The daily spark test is not considered a deployment.

### 2.2 Electronic Control Device (ECD)

A conducted energy device designed to transmit a disruptive electrical impulse to a target.

CONFIDENTIAL    Beck_20cv1280: USA_001715

Exhibit A

## Chapter 32: Electronic Control Device (ECD) Program

### 2.3 Infirm

Not physically or mentally strong, especially through age or illness.

### 2.4 Probes/Darts

Barbed projectiles fired from an ECD in order to transmit an electrical impulse to a target.

### 2.5 Unintentional Discharge

The unintentional deployment of an ECD cartridge.

### 3. POLICY

ECDs are approved for use according to this policy, and will be used in compliance with the agency use of force policy.

The ECD is an intermediate weapon that may be appropriate for use in some situations. It is not a substitute for deadly force. Commissioned employees must assess the effectiveness of each application and determine whether further applications are warranted or if a different tactic should be employed.

### 4. STANDARDS

This section sets forth minimum standards for use of ECDs.

### 4.1 General Conditions

Only commissioned employees will be authorized to carry ECDs for law enforcement purposes.

Only ECDs issued or otherwise approved by the NPS will be used by commissioned employees in the performance of their duties. The approved ECDs are the Taser International models X-26, X-26P, and X-2.

The X-26, X-26P, and X-2 will be entered into the NPS Property Management Division property database and will be issued a bar code property number.

As technology develops, future devices may be approved by the DCOP (see Chapter 43).

With the issuance of this policy, the use of the M-26 or XREP is not authorized and their use must be discontinued.

### 4.1.1 ECD Program Manager

The ECD Program Manager will be the point of contact for all topics related to ECDs and will be selected by the DCOP. The ECD Program Manager must have a Type I commission, and must be an ECD Instructor and Use of Force Instructor. This commissioned employee will have full responsibility to oversee the program.

ECD Program Manager Responsibilities:

1. Collect data from the field on ECD uses and generate a report to the NPS-LETC Superintendent annually.
2. Answer questions about policy and the ECD program.
3. Update the NPS ECD website with the most up-to-date information.
4. Be the liaison with the manufacturer and/or distributors.
5. Review use of force ECD reports and make recommendations.

### 4.2 ECD Use and Modes

### 4.2.1 ECD Use Parameters

ECDs may be used on individuals who are actively resisting a commissioned employee or to prevent individuals from harming themselves or others when such force is objectively reasonable.

Unless compelling reasons to do so can be clearly articulated, ECDs should not be used when the commissioned employee perceives that the use of an ECD may result in direct or secondary injuries, to include when:

- a subject may fall from a significant height;
- a subject is operating a moving vehicle or machinery;
- a subject is in or near a body of water that presents a risk of drowning;

CONFIDENTIAL
Exhibit A
Beck_20cv1280: USA_001716

Chapter 32: Electronic Control Device (ECD) Program

- a subject is believed to be contaminated by or otherwise near flammable or explosive materials; or
- subject is believed to be part of a high-risk group (e.g., the very young, the very old, the infirm, the visibly pregnant, etc.).

All ECD use will be consistent with agency-approved or recognized ECD training curricula, as determined by the Superintendent, NPS-LETC.

### 4.2.2  Spark Display

A spark display is the demonstration of the visible electrical current (without an actual application of the current to a suspect) and may be used with verbal commands to attempt to gain control.

### 4.2.3  Drive Stun

The device may be used in a "drive stun" mode. Use of the "drive stun" mode is subject to the same restrictions as that of the ECD in cartridge deployments. This maneuver has a limited, localized pain effect and does not cause incapacitation.

### 4.3  ECD Post-Deployment Procedures

As applicable, the following procedures will be implemented subsequent to an ECD deployment:

- If a commissioned employee reasonably believes that the recipient of an ECD application is in need of medical treatment, the employee will make reasonable efforts to obtain such treatment.
- Accompanied by a commissioned employee, subjects will be entered into the emergency medical services (EMS) system for medical care when they exhibit the following conditions:
  - ECD probe embedded in face, neck, joints, groin, bone, or female breast, or those that are difficult to remove or where the barb has detached.
  - High-risk subjects such as the very young, the very old, the infirm, visibly pregnant, etc.
  - Subjects who display signs of distress, hyperthermia, loss of consciousness, difficulty breathing, chest pain, or other severe symptom.
  - Subjects who received three or more ECD use cycles.
- ECD probes embedded in non-sensitive areas may be removed by a commissioned employee according to procedures outlined in training. Universal precautions for infection control will be followed, and the probes will be treated as biohazard sharps.
- When practical and appropriate, photographs of ECD probe impact sites should be taken before and after probe removal.
- Expended cartridges and probes will be placed into evidence. (Note: cartridges from training or negligent discharges do not need to be entered into evidence.)
- After their removal, inspect all probes to ensure they are not broken and place them in a sharps container for disposal.
- A use history report will be downloaded from the deployed ECD(s) as soon as practical.
- When a commissioned employee deploys an ECD outside of NPS jurisdiction, the officer may follow the post-deployment policy of the primary agency.

### 4.4  ECD Certification and Training

Prior to carrying or utilizing an ECD, commissioned employees will successfully complete the NPS ECD certification course approved by the Superintendent, NPS-LETC, as documented on the NPS-LETC website for any approved model of ECD (X-26, X-26P, X-2). Current users transitioning from an X-26 to X-26P require weapon familiarization and must demonstrate weapon-handling proficiency through the deployment of two ECD cartridges to an NPS-LETC approved ECD Instructor.

Instructors must be certified to teach the individual models and pass an oral board examination with the NPS-LETC ECD Program Manager.