**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

KIMBERLY BECK AND TRAVIS LORENTZ,
INDIVIDUALLY AND AS PERSONAL
REPRESENTATIVES OF CHARLES "GAGE"
LORENTZ, DECEASED,

        Plaintiffs,

vs.

                                    No. 2:20-CV-1280 MV/JHR

UNITED STATES OF AMERICA, and
ROBERT JOHN MITCHELL, INDIVIDUALLY
AND IN HIS OFFICIAL CAPACITY AS A
NATIONAL PARK RANGER

        Defendants.

**MEMORANDUM OPINION AND ORDER**

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment and Memorandum in Support ("Defendants' Motion for Summary Judgment") [Doc. 107]. In a Memorandum Opinion and Order entered on March 27, 2026 ("March 27, 2026 Order") [Doc. 157], the Court granted Defendant John Robert Mitchell's Motion for Judgment on the Pleadings [Doc. 106], thereby dismissing Count I, the sole count of the Complaint asserted against him. As a result of that dismissal, the Court found in the March 27, 2026 Order that to the extent that Defendants' Motion for Summary Judgment seeks dismissal of Count I, it is moot. Accordingly, in the instant Memorandum Opinion and Order, the Court addresses Defendants' Motion for Summary Judgment only to the extent that it seeks dismissal of Counts III and IV, the two counts of the Complaint asserted against the United States. Having considered the briefs and relevant law, and being otherwise fully informed, the Court finds that Defendants' Motion for Summary Judgment, as it relates to Counts III and IV, is well-taken only in part and will be granted in part and denied in part.

**BACKGROUND**

"The facts supported by evidence, [viewed] in the light most favorable to [Plaintiff]" as the party opposing summary judgment are as follows. *Cavanaugh v. Woods Cross City,* 625 F.3d 661, 662 (10th Cir. 2010). On March 21, 2020, while National Park Ranger John Mitchell was driving his marked vehicle in the Rattlesnake Springs area of Carlsbad Caverns National Park, he observed three young men hanging out near a reservoir. Doc. 107-1 at 219:10-14. Shortly afterwards, he observed a white pickup truck traveling in the opposite direction. *Id.* at 217:11-218:1. Charles "Gage" Lorentz, who was 25 years old at the time, was driving the truck. Doc. 1 at 1. Mr. Lorentz's truck almost hit Ranger Mitchell's vehicle and then swerved away to avoid a collision. Doc. 107-1 at 217:11-218:1. Ranger Mitchell observed Mr. Lorentz drive his truck into a National Park Service road sign, then drive away down a gravel road at what he perceived to be a rate of about 45 miles per hour. *Id.* at 197:5-12, 213:24-214:7. According to Ranger Mitchell, the posted speed limit was 15 miles per hour. *Id.* He characterized Mr. Lorentz's conduct as unsafe operation of a motor vehicle, a misdemeanor offense. *Id.* at 214:8-17. As a result, he activated his emergency lights and turned around to follow Mr. Lorentz. *Id.* at 201:8-16.

The three young men that Ranger Mitchell had observed were named Jai Rodriguez, Jalen Macareno, and Zacharyah Dominguez. They were standing by a loop in the road, near Mr. Macareno's truck. Doc. 107-2 at ¶ 4. Mr. Macareno stated in a sworn declaration that he saw Mr. Lorentz's white Ford truck "come down the road at about 40 miles an hour, drift around the loop, and stop in the loop beside my truck." *Id.* at ¶ 7.[1] Mr. Macareno and Mr. Dominguez both stated that they were approximately 25 feet away from where Mr. Lorentz stopped his truck and saw him

---

[1] Mr. Dominguez estimated that Mr. Lorentz was driving at about 60 miles per hour, Doc. 107-3 at ¶ 6, and Mr. Rodriguez estimated that he was driving between 40-50 miles per hour. Doc. 107-4 at ¶ 6.

get out of the truck and stand on the side of the road. *Id.* at ¶ 10; Doc 107-3 at ¶ 8. Both Mr. Macareno and Mr. Rodriguez noted that the running board on the passenger side of the truck was damaged. Doc. 107-1 at ¶ 8; Doc. 107-4 at ¶ 8. Mr. Macareno described that he "thought Mr. Lorentz looked mad or irritated as he glanced at me." *Id.*

By the time Ranger Mitchell had left his vehicle, Mr. Lorentz was standing by the side of road. *Id.* As he exited his vehicle, Ranger Mitchell turned on his body-worn camera. Doc. 107-1 at 209:18-23. The first thirty seconds of the footage are silent, due to the camera buffering. Doc. 107-5 at 33:2-34:3. During this period, Ranger Mitchell testified in a deposition that he said, "Talk to me and tell me what's going on today" to which Mr. Lorentz responded, "Where is he?" Doc. 107-5 at 270:18-271:1, 272:4-5. Ranger Mitchell then asked, "Where is who?" but Mr. Lorentz did not respond. *Id.* at 274:1-2. Ranger Mitchell also asked Mr. Lorentz his name and whether there was some emergency, but still received no response. *Id.* at 274:11-19.  When Ranger Mitchell asked Mr. Lorentz if he had identification on him, Mr. Lorentz responded, "Sure. It's in the truck. Why don't you go get it?" *Id.* at 274:20-275:1.

When the audio starts again, Ranger Mitchell can be heard saying, "Go ahead and step over here for me," while pointing towards a fence. Government's Exhibit F ("Ex. F") at 00:35. Mr. Lorentz complied with this order and stepped towards the fence. *Id.* at 00:40. Mr. Lorentz then started dancing to music being played from his truck. *Id.* at 00:45. Ranger Mitchell asked him to turn around, but Mr. Lorentz said, "No," and shook his head. *Id.* at 01:05-1:10. According to Ranger Mitchell, although it is not visible in the body-worn camera footage, at this point, he displayed his taser. Doc. 107-1 at 308:10-18. Mr. Lorentz then said, "Oh come on, get real with it. Other one," and made a gesture for Ranger Mitchell to come towards him. Ex. F at 01:15-1:20. Mr. Lorentz took three small steps towards Ranger Mitchell and put his hands in the front pockets

of his pants. *Id.* at 01:20. The footage from the body-worn camera then shows that Ranger Mitchell asked Mr. Lorentz to take his hands out of his pockets at 01:26. Two seconds later, at 01:28, Ranger Mitchell pointed the taser at Mr. Lorentz and deployed it. The video footage stops just after he deployed the taser. It is unclear why Ranger Mitchell's body-worn camera stopped recording, and approximately 26 seconds of footage are missing.[2]

According to Ranger Mitchell, he deployed his taser twice, but this had no effect on Mr. Lorentz. Doc. 107-1 at 172:5.[3] He then attempted a "drive stun," which involves placing the taser directly on a person's skin, but the attempt was unsuccessful. *Id.* Mr. Macareno stated in his affidavit that he then saw Mr. Lorentz "swing at the left side of Ranger Mitchell's face with a closed fist," but he was "not sure if the punch connected." Doc. 107-2 at ¶ 19. Mr. Dominguez stated that after the tasing, he saw Ranger Mitchell walk toward Mr. Lorentz and that Mr. Lorentz hit Ranger Mitchell on the left side of his face. Doc. 107-3 at ¶ 19. Mr. Rodriguez also stated that he saw Mr. Lorentz grab Ranger Mitchell around the head and hit him on the chin. Doc. 107-4 at ¶ 18. According to Mr. Rodriguez, Ranger Mitchell and Mr. Lorentz were then wrestling side by side and he saw Ranger Mitchell reach for his gun. *Id.* at ¶¶ 19-20. In his deposition, Ranger

---

[2] The United States asserts that "there is no evidence that Ranger Mitchell turned off the camera." Doc. 107 at 5. To support this claim, the United States points to the deposition of Bryan Chiles, who testified that the missing footage occurred due to a "temporary loss of communication" between the camera and the memory storage. Doc. 107-5 at 36:9-10. Viewing the evidence in the light most favorable to Plaintiff, Mr. Chiles's deposition is not definitive, as he indicates that his statements regarding what caused the camera to turn off were "all theory." *Id.* at 36:11. Accordingly, the Court cannot determine one way or another why the body worn camera turned off when Ranger Mitchell deployed his taser.

[3] Mr. Macareno, Mr. Dominguez, and Mr. Rodriguez all stated that Mr. Lorentz did not react to the taser when Ranger Mitchell first deployed it. Doc. 107-2 at¶ 17; Doc. 107-3 at ¶ 17; Doc. 107-4 at ¶ 15.

Mitchell testified that Mr. Lorentz attempted to get his gun out of his holster and started punching him in the head. Doc. 107-1 at 278:6-15. He stated:

> [Mr. Lorentz] hit me in the face before he knocked me on the ground, and then he started punching me in the face and head . . . then he attempted to take the weapon, and he leaned across me and used both hands to try and take it. I was holding it into the holster. He couldn't get it. He went back to hitting me. I drew the weapon and delivered the first shot.

*Id.* at 279:24-25 – 280:1, 281:1-5.

When the footage from the body-worn camera resumes, it shows both of Ranger Mitchell's hands on his firearm on the ground, and it appears that Mr. Lorentz's hand was also near or on the firearm. Government's Exhibit G ("Ex. G") at 0:00. The parties agree that Ranger Mitchell first shot Mr. Lorentz in the thigh, and then in the chest. Doc. 107-1 at 281:4-13; Ex. G at 0:05. According to Ranger Mitchell, he was unsure if the first shot had hit Mr. Lorentz, so he fired a second time, into his chest. *Id.* at 316: 3-6. The footage is difficult to parse, even when slowed down, but there is at least one moment during which Mr. Lorentz can be seen lying on his back on the ground with Ranger Mitchell pinning him down with his left hand while pointing his firearm directly at Mr. Lorentz's chest. Ex. G at 0:04. With the gun only a few inches above Mr. Lorentz's chest, Ranger Mitchell fired the second shot. *Id.* After shooting Mr. Lorentz in the chest, Ranger Mitchell backed away, still pointing the firearm at Mr. Lorentz, who was rolling around on the ground. *Id.* at 0:05-0:10. As he backed away, Mr. Lorentz can be seen turning over onto his stomach and then lying motionless. *Id.* at 0:20. Ranger Mitchell then went to his vehicle to use the radio and call for back up. *Id.* at 0:25 As he returned to where Mr. Lorentz was lying on the ground motionless, Ranger Mitchell once again pointed his firearm at him. *Id.* at 0:25-1:41. After Mr. Lorentz had been lying on the ground for approximately three minutes, Ranger Mitchell then approached and handcuffed him. *Id.* at 3:30. When he approached, Mr. Lorentz was not moving,

and his eyes were closed. *Id.* Ranger Mitchell then stood near his vehicle for approximately four minutes, went to check on Mr. Lorentz, tried to flip over his body, and then returned to his vehicle to put gloves on. *Id.* at 7:00- 7:40. He pulled out a first aid kit from the trunk of his vehicle and retrieved an oxygen mask. *Id.* at 12:00. He placed the oxygen mask on Mr. Lorentz approximately twelve minutes after shooting him in the chest. *Id.* at 12:10. In the footage, when Ranger Mitchell got closer to Mr. Lorentz, it appears that Mr. Lorentz had several scrapes and bruises on his face. *Id.* After putting the oxygen mask on Mr. Lorentz, Ranger Mitchell went back to his vehicle to drink coffee. *Id.* at 13:04. Then, Ranger Mitchell returned to where Mr. Lorentz was lying and started cutting Mr. Lorentz's clothes off of him. *Id.* at 13:04-14:28. He applied gauze to the gunshot wound in the middle of Mr. Lorentz's chest. *Id.* at 15:00-16:43.

Approximately nineteen minutes after Ranger Mitchell shot Mr. Lorentz in the chest, officers from the Eddy County Sherrif's Department arrived and attempted to perform CPR on Mr. Lorentz. Ex. G at 19:00-19:30. Their attempts failed, and Mr. Lorentz died from the gunshot wound to the chest. Ranger Mitchell testified that he did not find any weapons on Mr. Lorentz's person. Doc. 107-1 at 319:11-17.[4]

Based on these facts, Plaintiffs bring two claims against the United States under 28 U.S.C. § 1346(b)(1), known as the Federal Tort Claims Act ("FTCA"). Plaintiffs claim in Count III of the Complaint that the United States is liable because Ranger Mitchell committed battery and false imprisonment against Mr. Lorentz. Doc. 1 at ¶¶ 114-124. Count IV of the Complaint alleges that

---

[4] The United States objects to and asks the Court to exclude Plaintiffs' Exhibits 10, 11, 12, and 14. Exhibit 10 is a declaration from Jason C. Fries, the Plaintiffs' proposed expert in "forensic animation, forensic laser scanning, forensic video analysis, laser-based photogrammetry, and scientific method." Exhibit 11 is his report. Exhibit 12 is an affidavit from Mr. DeFoe providing his opinion on Ranger Mitchell's actions. Exhibit 14 is a "Drone Photo." Ultimately, the Court finds that even without considering these exhibits, there are genuine material issues of fact for trial. Thus, the Court need not wade into the issue of the admissibility of these exhibits.

the United States is liable because Ranger Mitchell breached his duty to act as a reasonable officer under the circumstances and negligently shot and killed Mr. Lorentz. Doc. 1 at ¶¶ 125-132. On the instant motion, the United States seeks summary judgment on Counts III and IV "because Ranger Mitchell's actions were privileged or supported by probable cause under New Mexico law." Doc. 107 at 2.

## LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the initial burden of establishing that there is an absence of evidence to support the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant meets this burden, the non-movant must come forward with specific facts, supported by admissible evidence, that demonstrate the existence of a genuine dispute of material fact. *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1526 n. 11 (10th Cir. 1992). Facts are material if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In deciding a summary judgment motion, the court "construe[s] the factual record and the reasonable inferences therefrom in the light most favorable to the nonmoving party." *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005). However, the court may not "weigh the evidence, pass on the credibility of witnesses, or substitute [its] judgment for that of the jury." *Allen v. Wal-Mart Stores, Inc.,* 241 F.3d 1293, 1297 (10th Cir. 2001) (quoting *Kinser v. Gehl Co.,* 184 F.3d 1259, 1267 (10th Cir. 1999), *abrogated on other grounds by Weisgram v. Marley Co.,* 528 U.S. 440 (2000)).

**DISCUSSION**

In Count III, Plaintiffs assert that the United States is liable both for false imprisonment, because Ranger Mitchell arrested Mr. Lorentz "without probable cause," and for battery, because Ranger Mitchell "used unreasonable and excessive force to effectuate the arrest" by tasing him, wrestling with him, shooting him in the leg, and shooting him in the chest, actions which a "reasonable officer" in his position would not have believed to be justified." Doc. 1 at ¶¶ 119-124. In Count IV, Plaintiffs assert that the United States is liable for negligence, because "[i]n pursuing, threatening, tasing, shooting, and ultimately killing [Mr. Lorentz], [Ranger] Mitchell breached his duty to act as a reasonable officer under the circumstances." *Id.* at ¶¶ 128-132.

These claims are predicated on the United States' waiver of sovereign immunity under the FTCA. *Ayala v. United States*, 49 F.3d 607, 610 (10th Cir. 1995). The FTCA "waive[s] the sovereign immunity of the United States for certain torts, [including negligent and wrongful acts and omissions resulting in injury or death,] committed by federal employees acting within the scope of their employment." *Brownback v. King*, 592 U.S. 209, 212 (2021) (citations omitted). Relevant here, the FTCA waiver applies only in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also* 28 U.S.C. § 2674 (stating that the United States is liable under the FTCA "in the same manner and to the same extent as a private individual under like circumstances"). Accordingly, "the government is not liable under the FTCA unless state law recognizes a comparable liability for private persons." *Ayala,* 49 F.3d at 611. The court therefore must "look to the law of the state in which the alleged tortious activity occurred to resolve the question of liability under the FTCA," *id.,* which here is New Mexico. If the alleged tortious activity has no "private person analogue under New Mexico law," the federal court lacks

subject matter jurisdiction over the claim. *Poncho-Alderete v. United States,* 22-CV-153, 2024 WL 2132394, at *11-12 (D.N.M. May 8, 2024) (citing *Brownback,* 592 U.S. at 212; *United States v. Agronics,* 164 F.3d 1343, 1346 (10th Cir. 1999)); *see also Murphy v. United States,* 20-CV-557, 2020 WL 6939716, at *3 (D.N.M. Nov. 25, 2020) ("Determining whether the alleged facts in Plaintiff's complaint establish the requisite private person analogue for jurisdiction requires the Court to resolve whether New Mexico law would hold a private person similarly situated to the [government employees] negligent based on the alleged facts.").

Because Plaintiffs' battery and negligence claims turn on the same analysis of the reasonableness of Ranger Mitchell's actions, the Court will consider those claims together. The Court next will turn to Plaintiffs' false imprisonment claim.

I.      Battery and Negligence Claims

In New Mexico, "the elements of civil and criminal assault and battery are essentially identical." *New Mexico v. Ortega,* 827 P.2d 152, 155 (N.M. Ct. App. 1992). A tortfeasor is liable for battery if: "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive contact with the person of the other directly or indirectly results." *Id.* (quoting *Restatement (Second) of Torts* § 18(1)(a)-(b) (1965)); *see also* N.M. Stat. Ann. § 30–3–4 ("Battery is the unlawful, intentional touching or application of force to the person of another, when done in a rude, insolent or angry manner.") (defining the elements of criminal battery). As to the severity of contact, no actual injury to the plaintiff is required in order to establish liability. *See Selmeczki v. N.M. Dep't of Corr.,* 129 P.3d 158, 167 (N.M. Ct. App. 2006) ("It is black-letter law that causing an offensive touching, even indirectly to another's clothing and not resulting in injury, is the tort of battery.").

9

When making lawful arrests, law enforcement officers generally enjoy a privilege to use whatever force is "reasonably necessary" for the enforcement of the law. *Hernandez v. Parker,* 508 P.3d 947, 958 (N.M. Ct. App. 2022) (citing *Reynaga v. County of Bernalillo,* 64 F.3d 670 (10th Cir. 1995) (unpublished table opinion)); *see also Mead v. O'Connor,* 344 P.2d 478, 479-80 (N.M. 1959) ("Officers, within reasonable limits, are the judges of the force necessary to enable them to make arrests or preserve the peace."). However, when officers act unreasonably and use excessive force, they may be liable for civil battery. *Id.*

In a civil battery suit based on the actions of a law enforcement officer, the relevant analysis "includes both an objective and a subjective test," and thus is different from the Fourth Amendment excessive force analysis, which is "famously a strictly objective test." *Cruz v. City of Deming*, 138 F.4th 1257, 1272 (10th Cir. 2025) (citation omitted); *see also Hernandez,* 508 P.3d at 958 ("[T]he traditional defenses for law enforcement to assert in response to civil assault and battery claims are not the same as the 'objectively reasonable officer' standard that is at the root of the Fourth Amendment analysis."). Accordingly, the officer "must subjectively believe that he or she used no more force than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the same situation." *Hernandez*, 508 P.3d at 958; *see also Cruz,* 138 F.4th at 1272 (holding the same). As to the objective portion of this analysis, New Mexico courts apply the factors set out in *Graham v. Connor,* 490 U.S. 386 (1989). *See State v. Ellis,* 186 P.3d 245, 251 (N.M. 2008) (citing and applying the *Graham* factors in determining whether a reasonable jury could find that an officer used excessive force against the defendant). In *Graham,* the Supreme Court held that when considering the objective reasonableness of an officer's actions, courts must assess the totality of the circumstances, "including the severity of the crime at issue,

10

whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396.

The reasonableness of an officer's use of force is similarly central to the determination of a negligence claim brought on the basis of such force, as New Mexico's privilege for law enforcement officers to use reasonable force "applies not only to assault and battery claims, but also to negligence and recklessness claims." *Serrano v. United States*, 766 F. App'x 561, 568 (10th Cir. 2019) (citing *Alaniz v. Funk*, 364 P.2d 1033, 1034-36 (N.M. 1961)). Accordingly, in a negligence suit based on the actions of a law enforcement officer, such officer "has the duty in any activity actually undertaken to exercise for the safety of others that care ordinarily exercised by a reasonably prudent and qualified officer in light of the nature of what is being done." *Cross v. City of Clovis*, 755 P.2d 589, 591 (1988).

Ultimately, "the defendant bears the burden to establish the defense or privilege" of reasonableness. *Cruz,* 138 F.4th at 1272. Notably, "in state court, the question of reasonableness is generally reserved for the jury." *Hernandez,* 508 P.3d at 959. Accordingly, in order to obtain summary judgment in its favor on Plaintiffs' battery and negligence claims, the United States bears the burden to establish the reasonableness of Ranger Mitchell's challenged actions.

Here, Plaintiffs argue that there are two relevant inflection points in the series of events that occurred on March 21, 2020, namely Ranger Mitchell's decision to deploy his taser and his decision to fatally shoot Mr. Lorentz in the chest, where Ranger Mitchell's use of force was excessive and unreasonable. For these inflection points, the United States must establish both that Ranger Mitchell subjectively believed his actions were reasonably necessary and that his actions were objectively reasonable.

11

With respect to Ranger Mitchell's subjective beliefs, in his deposition testimony, he stated that he first deployed his taser because, when Mr. Lorentz told him to get the "other one," he believed that Mr. Lorentz was referring to his gun and intended to escalate the encounter or become aggressive. Doc. 107-1 at 324:9-11. Regarding his state of mind when he fired the second shot into Mr. Lorentz's chest, Ranger Mitchell asserted that he fired the second shot because Mr. Lorentz had been reaching for his firearm and punching him in the head and that he was not sure if the first shot hit Mr. Lorentz. *Id.* at 282:20-21, 279:1-281:13. Thus, the United States has presented evidence that Ranger Mitchell subjectively believed that his actions were reasonably necessary.

Plaintiffs argue that there are several reasons to discredit this evidence. First, they note that Ranger Mitchell has given inconsistent statements. During his deposition, Ranger Mitchell conceded that, although he had earlier given a statement to investigating officers that he had fired the second shot as he was backing away from Mr. Lorentz, he "realized now," after watching the body-worn camera footage, that in fact he had shot Mr. Lorentz while he was holding him down on the ground. Doc. 68-5; 107-1 at 249:9-15, 246:17-21. Ranger Mitchell also admitted that, during the "walkthrough" of the incident, he told investigators that before firing the second shot, Mr. Lorentz had stood up and was "coming for [him]." *Id.* at 251:17-21. The footage from the body-worn camera shows otherwise, as Ranger Mitchell clearly fired the second shot while holding Mr. Lorentz down on the ground. When asked why he told investigating officers that Mr. Lorentz was coming for him, Ranger Mitchell testified, "It was what I remembered at the time." *Id.* at 252:3. Plaintiffs further note that Ranger Mitchell's testimony is unreliable because he does not have a clear memory of when Mr. Lorentz touched his gun, *id.* at 353:17-21, nor does he remember when he pulled the trigger the second time. *Id.* at 260:19-22.

12

From Ranger Mitchell's own testimony, there is evidence that he subjectively believed that his actions were reasonably necessary, but there is also evidence that his memory is unreliable, and that his previous statements contradict incontrovertible evidence. Faced with this conflicting evidence, the Court cannot determine whether the United States has carried its burden to show that Ranger Mitchell did, in fact, believe that his actions were reasonably necessary. At the summary judgment stage, the Court cannot weigh evidence or assess a witness's credibility. *Allen,* 241 F.3d at 1297. Further, "summary judgment is improper where an issue turns on credibility." *Nat'l Aviation Underwriters, Inc. v. Altus Flying Service, Inc.,* 555 F.2d 778, 784 (10th Cir. 1977). Indeed, "it is particularly wrong to base summary judgment on the deposition of an interested party." *Id.* The Court cannot usurp the function of the jury and assess the testimony of Ranger Mitchell, whose culpability, or lack thereof, is central to Plaintiffs' case. Accordingly, the Court finds that the question of Ranger Mitchell's subjective belief of the reasonableness of his actions must be reserved for the jury.

The Court equally finds that the objective reasonableness of Ranger Mitchell's decisions to deploy the taser and to fire the fatal shot into Mr. Lorentz's chest cannot be decided as a matter of law, because a reasonable jury could find that, compared with the "hypothetical reasonable police officer placed in the same situation," Ranger Mitchell's actions were not reasonably necessary. *Hernandez,* 508 P.3d at 958. With regard to Ranger Mitchell's decision to deploy the taser, as an initial matter, the United States correctly notes that there is evidence that after being tased, Mr. Lorentz was either not actually shocked or, at the very least, was unaffected by the shock. Doc. 107 at 12. Based on this evidence, the United States contends that the tasing could not have been excessive. *Id.* The law is clear, however, that no actual injury to the plaintiff is required

in order to establish liability. *Selmeczki,* 129 P.3d at 167. Thus, the United States' argument is inapposite, and the Court must apply the *Graham* factors to determine objective reasonableness.

First, regarding the severity of the offense, the parties agree that Ranger Mitchell was investigating a misdemeanor traffic offense. Next, the footage shows that Mr. Lorentz was already waiting for Ranger Mitchell outside of his truck when Ranger Mitchell arrived, which indicates that Mr. Lorentz did not intend to flee. Further, viewing the evidence in the light most favorable to Plaintiffs, Mr. Lorentz's behavior in the body-worn camera footage is, at most, confusing and odd, but he does not appear to be completely resisting Ranger Mitchell's orders. Mr. Lorentz complied with Ranger Mitchell's request to step over towards the fence. While he shook his head no when Ranger Mitchell asked him to turn around, this cannot be separated from the fact that Mr. Lorentz apparently made certain incoherent and random statements (asking "Where is he?" and telling Ranger Mitchell to go get his identification from his truck). He was also dancing to music from his truck and although his hands were in his front pockets, he maintained a relaxed posture throughout the encounter. It is arguable that Mr. Lorentz was acting strangely, rather than actively resisting arrest. Indeed, Ranger Mitchell did not give Mr. Lorentz a meaningful opportunity to comply with his order to take his hands out of his pockets before tasing him, as only two seconds elapsed between giving the order and deploying the taser. *See Casey v. City of Federal Heights,* 509 F.3d 1278, 1282 (10th Cir. 2007) (officer acted unreasonably where he should have given the arrestee, who was suspected of a misdemeanor and was not actively resisting arrest, "a chance to submit peacefully to an arrest").

All of the *Graham* factors thus weigh in favor of finding that Ranger Mitchell's decision to tase Mr. Lorentz was unreasonable and excessive. As the Tenth Circuit has noted, "force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest." *Casey,* 509

F.3d at 1285; *see also Wagner v. Lieutenant James Jones,* No. 13-CV-771, 2015 WL 13662791, at *4 (D.N.M May 8, 2015) (a "leg sweep" maneuver executed during arrest was likely not warranted for arrest of Plaintiff for a traffic offense, namely driving under the influence of alcohol). Thus, viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find that Ranger Mitchell's decision to tase Mr. Lorentz was excessive and unreasonable.

With regard to Ranger Mitchell's decision to fire a second shot, the entire lead-up to the shooting, from the initial deployment of the taser to when Ranger Mitchell and Mr. Lorentz are struggling on the ground, is missing from the body-worn camera footage. The United States' version of events therefore depends on four eyewitnesses, including Ranger Mitchell himself. Ranger Mitchell testified that Mr. Lorentz was reaching for his firearm and hitting him on the head and that he fired the second shot because he was not sure if the first one had actually struck Mr. Lorentz. As noted above, however, the Court cannot base a summary judgment decision solely on the deposition of an interested party. *Nat'l Aviation Underwriters, Inc.,* 555 F.2d at 784. Thus, the Court is left with the declarations of eyewitnesses Mr. Macareno, Mr. Dominguez, and Mr. Rodriguez, all of whom stated that Mr. Lorentz was unaffected by the taser and started hitting Ranger Mitchell on the head. Doc. 107-2 at ¶ 19; Doc. 107-3 at ¶ 19; Doc. 107-4 at ¶ 18. Mr. Dominguez also stated that he saw Mr. Lorentz try to grab Ranger Mitchell's gun. Doc. 107-3 at ¶ 24. These statements weigh in favor of finding that Ranger Mitchell's actions were reasonable.

Plaintiffs argue, however, that these eyewitness statements are not credible, because, to the extent that there is footage from the body-worn camera, that footage contradicts their testimony. In particular, Plaintiffs note that Mr. Dominguez stated that "when both [Mr. Lorentz and Ranger Mitchell] had their hands on Ranger Mitchell's gun, the gun discharged," but the body-worn camera footage shows that when the gun discharged, only Ranger Mitchell had his hands on the

gun. Further, Plaintiffs note that the three eyewitnesses stated that they never saw Ranger Mitchell hit Mr. Lorentz on the face and head with the taser, but in the body-worn camera footage, Mr. Lorentz's face appears to have several scrapes and bruises. The Court also notes that in the video footage, only one person can be seen standing next to a truck near the loop in the road, while the other two witnesses are not visible. Thus, the video footage arguably contradicts the statements of at least two of the young boys who stated that they were able to see the struggle.

"[A]t the summary judgment stage, the party challenging the credibility of a sworn statement must produce specific facts in order to put credibility in issue so as to preclude summary judgment." *Helvie v. Jenkins,* 66 F.4th 1227, 1235 (10th Cir. 2023). In meeting this burden, a party "can rely on circumstantial evidence to challenge a sworn statement." *Id.* Here, the Court finds that Plaintiffs have come forward with sufficient evidence to put the credibility of Mr. Macareno, Mr. Dominguez, and Mr. Rodriguez into question so as to preclude summary judgment. The jury is not required to believe the testimony of these three eyewitnesses, especially as they will have to assess their capacity for recalling the incident, whether they had a clear line of sight, and whether they could hear what Ranger Mitchell and Mr. Lorentz were saying. The Court equally cannot rely on the declarations of these eyewitnesses in making its summary judgment decision, as, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 151 (2000).

With 26 seconds of key footage missing, and without being able to rely on the testimony of eyewitnesses, the Court cannot assess whether Ranger Mitchell's decision to shoot Mr. Lorentz in the chest was objectively reasonable. Accordingly, just as with Ranger Mitchell's subjective

16

belief of the reasonableness of his actions, the question of the objective reasonableness of Ranger Mitchell's actions is best reserved for the jury.

The United States thus has failed it meet its burden to establish, as a matter of law, that (1) Ranger Mitchell subjectively believed his actions were reasonably necessary and (2) Ranger Mitchell's actions were objectively reasonable. Because genuine questions of material fact remain as to both the subjective and objective reasonableness analysis, the Court cannot grant summary judgment in the United States' favor on either Plaintiffs' battery claim or their negligence claim. *Committee for First Amendment,* 962 F.2d at 1521.

II.     False Imprisonment Claim

Plaintiffs claim that Ranger Mitchell falsely arrested, and thus falsely imprisoned, Mr. Lorentz. In New Mexico, the tort of false imprisonment occurs when a person intentionally confines or restrains another person without consent and with knowledge that he has no lawful authority to do so." *Santillo v. N.M. Dep't. of Public Safety,* 173 P.3d 6, 10 (N.M. Ct. App. 2007). A false arrest is one way of committing false imprisonment. *Id.* (quoting 32 Am. Jur. 2d *False Imprisonment* § 3 (2007)). An officer who has probable cause to arrest a person, however, cannot be held liable for false imprisonment. *Id.* ("[P]robable cause provides [the officer] with the necessary authority to carry out the arrest."). The burden of proof is on the officer to show that "he or she acted in good faith and with probable cause and therefore lawfully under the circumstances." *New Mexico v. Johnson,* 930 P.2d 1148, 1153 (N.M. 1996). Probable cause exists when "at the moment the arrest was made . . . the facts and circumstances within [an officer's] knowledge . . . were sufficient to warrant a prudent man in believing that the accused had committed or was committing an offense." *Id.* (alterations in original) (quoting *Rodarte v. City of Riverton,* 552 P.2d 1245, 1252-53 (Wyo. 1976)).

17

In requesting summary judgment in its favor on Plaintiffs' false imprisonment claim, the United States contends that Ranger Mitchell had probable cause to detain Mr. Lorentz and therefore did not commit the tort of false imprisonment. In support of this contention, the United States cites as evidence Ranger Mitchell's testimony that, before stopping him, he saw Mr. Lorentz driving above the posted speed limit and hit a park sign. Ranger Mitchell testified that he believed that Mr. Lorentz had committed the misdemeanor offense of unsafe operation of a motor vehicle, which is an offense for which an officer has probable cause to make an arrest. The United States notes that this is a full defense to false imprisonment, as a law enforcement officer cannot be held liable for false imprisonment where there is probable cause to make an arrest. *Santillo,* 173 P.3d at 10.

In the face of the United States' evidence establishing that Ranger Mitchell had probable cause to arrest Mr. Lorentz, and thus that his arrest did not constitute a false arrest, Plaintiffs were required to come forward with specific facts, supported by admissible evidence, that demonstrate the existence of a genuine dispute of a material fact. *Comm. for First Amendment,* 962 F.2d at 1526 n. 11. Plaintiffs, however, failed to do so. Indeed, to the contrary, they concede in their Response that Ranger Mitchell suspected Mr. Lorentz of speeding and violating 36 CFR 4.22, which makes the unsafe operation of a vehicle a misdemeanor offense for which an arrest is supported by probable cause. *See* Plaintiffs' Additional Material Facts, Doc. 137 at 7. Plaintiffs thus have failed to meet their burden to demonstrate the existence of a genuine dispute of material fact. Accordingly, the Court will grant summary judgment in the United States' favor on Plaintiffs' false imprisonment claim.

## CONCLUSION

The United States has failed it meet its burden to establish, as a matter of law, that the force used by Ranger Mitchell in tasing Mr. Lorentz and in firing the second shot that proved fatal was reasonably necessary, either subjectively or objectively. Accordingly, a genuine dispute as to material fact remains as to whether the United States is liable for battery and negligence. The United States has, however, carried its burden to establish, as a matter of law, that Ranger Mitchell had probable cause to arrest Mr. Lorentz, and Plaintiffs have not come forward with specific facts, supported by admissible evidence, to demonstrate the existence of a genuine dispute of material fact as to whether Ranger Mitchell had probable cause to arrest Mr. Lorentz. Accordingly, summary judgment in the United States' favor is warranted on Plaintiffs' false imprisonment claim.

**IT IS THEREFORE ORDERED** that Defendant United States' Motion for Summary Judgment [Doc. 107] is **denied in part and granted in part,** as follows: (1) Plaintiffs' claim for battery, as set forth in Count III, remains viable; (2) Plaintiffs' claim for false imprisonment, as set forth in Count III, is dismissed; and (3) Plaintiffs' claim for negligence, as set forth in Count IV, remains viable.

DATED this 1st day of July 2026.

_____
MARTHA VAZQUEZ
Senior United States District Judge

19