**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

KIMBERLY BECK AND TRAVIS LORENTZ,
INDIVIDUALLY AND AS PERSONAL
REPRESENTATIVES OF CHARLES "GAGE"
LORENTZ, DECEASED,

        Plaintiffs,

vs.

                         No. 2:20-CV-1280 MV/JHR

UNITED STATES OF AMERICA, and
ROBERT JOHN MITCHELL, INDIVIDUALLY
AND IN HIS OFFICIAL CAPACITY AS A
NATIONAL PARK RANGER

        Defendants.

**MEMORANDUM OPINION AND ORDER**

THIS MATTER is before the Court on Plaintiffs' Motion for Summary Judgment [Doc. 110]. In a Memorandum Opinion and Order entered on March 27, 2026 ("March 27, 2026 Order") [Doc. 157], the Court granted Defendant Robert John Mitchell's Motion for Judgment on the Pleadings [Doc. 106], thereby dismissing Count I, the sole count of the Complaint asserted against him. As a result of this dismissal, the Court found in the March 27, 2026 Order that to the extent that Plaintiffs' Motion for Summary Judgment seeks dismissal of Count I, it is moot. Furthermore, in a Memorandum Opinion and Order entered contemporaneously herewith, the Court grants in part the United States' Motion for Summary Judgment [Doc. 107] with respect to Plaintiffs' claim for false imprisonment, raised in Count III of the Complaint. Accordingly, in the instant Memorandum Opinion and Order, the Court addresses Plaintiffs' Motion for Summary Judgment only to the extent that it seeks dismissal of Counts III and IV and only as it relates to Plaintiffs' claims of battery and negligence. Having considered the briefs and relevant law, and being

otherwise fully informed, the Court finds that Plaintiffs' Motion for Summary Judgment, as it relates to Counts III and IV, is not well-taken and will be denied.

## BACKGROUND

"The facts supported by evidence, [viewed] in the light most favorable to [Defendant]" as the party opposing summary judgment are as follows. *Cavanaugh v. Woods Cross City,* 625 F.3d 661, 662 (10th Cir. 2010). On March 21, 2020, while National Park Ranger Robert John Mitchell was driving his marked vehicle in the Rattlesnake Springs area of Carlsbad Caverns National Park, he observed three young men hanging out near a reservoir. Doc. 107-1 at 219:10-14. Shortly afterwards, he observed a white pickup truck traveling in the opposite direction. *Id.* at 217:11-218:1. Charles "Gage" Lorentz, who was 25 years old at the time, was driving the truck. Doc. 1 at 1. Mr. Lorentz's truck almost hit Ranger Mitchell's vehicle and then swerved away to avoid a collision. Doc. 107-1 at 217:11-218:1. Ranger Mitchell observed Mr. Lorentz drive his truck into a National Park Service road sign, then drive away down a gravel road at what he perceived to be a rate of about 45 miles per hour. *Id.* at 197:5-12, 213:24-214:7. According to Ranger Mitchell, the posted speed limit was 15 miles per hour. *Id.* He characterized Mr. Lorentz's conduct as unsafe operation of a motor vehicle, a misdemeanor offense. *Id.* at 214:8-17. As a result, he activated his emergency lights and turned around to follow Mr. Lorentz. *Id.* at 201:8-16.

The three young men that Ranger Mitchell had observed were named Jai Rodriguez, Jalen Macareno, and Zacharyah Dominguez. They were standing by a loop in the road, near Mr. Macareno's truck. Doc. 107-2 at ¶ 4. Mr. Macareno stated in a sworn declaration that he saw Mr. Lorentz's white Ford truck "come down the road at about 40 miles an hour, drift around the loop,

2

and stop in the loop beside my truck." *Id.* at ¶ 7.[1] Mr. Macareno and Mr. Dominguez both stated that they were approximately 25 feet away from where Mr. Lorentz stopped his truck and saw him get out of the truck and stand on the side of the road. *Id.* at ¶ 10; Doc 107-3 at ¶ 8. Both Mr. Macareno and Mr. Rodriguez noted that the running board on the passenger side of the truck was damaged. Doc. 107-1 at ¶ 8; Doc. 107-4 at ¶ 8. Mr. Macareno described that he "thought Mr. Lorentz looked mad or irritated as he glanced at me." *Id.*

By the time Ranger Mitchell had stepped out of his vehicle, Mr. Lorentz was standing by the side of road. *Id.* As he exited his vehicle, Ranger Mitchell turned on his body-worn camera. Doc. 107-1 at 209:18-23. The first thirty seconds of the footage are silent, due to the camera buffering. Plaintiffs' Exhibit 3 ("Ex. 3") at 33:2-34:3. Ranger Mitchell did not smell any marijuana or alcohol coming from Mr. Lorentz, nor did he ask him if he had consumed any substances. Doc. 110-1 at 212:13-214:22. He testified in his deposition that he said, "Talk to me and tell me what's going on today," to which Mr. Lorentz responded, "Where is he?" Doc. 107-5 at 270:18-271:1, 272:4-5. Ranger Mitchell then asked, "Where is who?" but Mr. Lorentz did not respond. *Id.* at 274:1-2. Ranger Mitchell also asked Mr. Lorentz his name and whether there was some emergency but still received no response. *Id.* at 274:11-19. When Ranger Mitchell asked Mr. Lorentz if he had identification on him, Mr. Lorentz responded, "Sure. It's in the truck. Why don't you go get it?" *Id.* at 274:20-275:1.

When the audio starts again, Ranger Mitchell can be heard saying, "Go ahead and step over here for me," while pointing towards a fence. Ex. 3 at 00:35. Mr. Lorentz complied with this order and stepped towards the fence. *Id.* at 00:40. Mr. Lorentz then started dancing to music being played

---

[1] Mr. Dominguez estimated that Mr. Lorentz was driving at about 60 miles per hour, Doc. 107-3 at ¶ 6, and Mr. Rodriguez estimated that he was driving between 40-50 miles per hour. Doc. 107-4 at ¶ 6.

from his truck. *Id.* at 00:45. Ranger Mitchell asked him to turn around, but Mr. Lorentz said, "No," and shook his head. *Id.* at 01:05-1:10. According to Ranger Mitchell, although it is not visible in the body-worn camera footage, at this point, he displayed his taser. Doc. 107-1 at 308:10-18. Mr. Lorentz then said, "Oh come on, get real with it. Other one," and made a gesture for Ranger Mitchell to come towards him. Ex. 3 at 01:15-1:20. Mr. Lorentz took three small steps towards Ranger Mitchell and put his hands in the front pockets of his pants. *Id.* at 01:20. The footage from the body-worn camera then shows that Ranger Mitchell asked Mr. Lorentz to take his hands out of his pockets at 01:26. Two seconds later, at 01:28, Ranger Mitchell pointed the taser at Mr. Lorentz and deployed it. The video footage stops just after he deployed the taser. It is unclear why Ranger Mitchell's body-worn camera stopped recording, and approximately 26 seconds of footage are missing.

According to Ranger Mitchell, he deployed his taser twice, but this had no effect on Mr. Lorentz. Doc. 107-1 at 172:5.[2] He then attempted a "drive stun," which involves placing the taser directly on a person's skin, but the attempt was unsuccessful. *Id.* Mr. Macareno stated in his affidavit that he then saw Mr. Lorentz "swing at the left side of Ranger Mitchell's face with a closed fist," but he was "not sure if the punch connected." Doc. 107-2 at ¶ 19. Mr. Dominguez stated that after the tasing, he saw Ranger Mitchell walk toward Mr. Lorentz and that Mr. Lorentz hit Ranger Mitchell on the left side of his face. Doc. 107-3 at ¶ 19. Mr. Rodriguez also stated that he saw Mr. Lorentz grab Ranger Mitchell around the head and hit him on the chin. Doc. 107-4 at ¶ 18. According to Mr. Rodriguez, Ranger Mitchell and Mr. Lorentz were then wrestling side by side and he saw Ranger Mitchell reach for his gun. *Id.* at ¶¶ 19-20. In his deposition, Ranger

---

[2] Mr. Macareno, Mr. Dominguez, and Mr. Rodriguez all stated that Mr. Lorentz did not react to the taser when Ranger Mitchell first deployed it. Doc. 107-2 at ¶ 17; Doc. 107-3 at ¶ 17; Doc. 107-4 at ¶ 15.

Mitchell testified that Mr. Lorentz attempted to get his gun out of his holster and started punching him in the head. Doc. 107-1 at 278:6-15. He stated:

> [Mr. Lorentz] hit me in the face before he knocked me on the ground, and then he started punching me in the face and head . . . then he attempted to take the weapon, and he leaned across me and used both hands to try and take it. I was holding it into the holster. He couldn't get it. He went back to hitting me. I drew the weapon and delivered the first shot.

*Id.* at 279:24-25 – 280:1, 281:1-5.

When the footage from the body-worn camera resumes, it shows both of Ranger Mitchell's hands on his firearm on the ground, and it appears that Mr. Lorentz's hand was also near or on the firearm. Government's Exhibit G ("Ex. G") at 0:00. The parties agree that Ranger Mitchell first shot Mr. Lorentz in the thigh, and then in the chest. Doc. 107-1 at 281:4-13; Ex. G at 0:05. According to Ranger Mitchell, he was unsure if the first shot had hit Mr. Lorentz, so he fired a second time, into his chest. *Id.* at 316: 3-6. The footage is difficult to parse, even when slowed down, but there is at least one moment during which Mr. Lorentz can be seen lying on his back on the ground with Ranger Mitchell pinning him down with his left hand while pointing his firearm directly at Mr. Lorentz's chest. Ex. G at 0:04. With the gun only a few inches above Mr. Lorentz's chest, Ranger Mitchell fired the second shot. *Id.* After shooting Mr. Lorentz in the chest, Ranger Mitchell backed away, still pointing the firearm at Mr. Lorentz, who was rolling around on the ground. *Id.* at 0:05-0:10. As he backed away, Mr. Lorentz can be seen turning over onto his stomach and then lying motionless. *Id.* at 0:20. Ranger Mitchell then went to his vehicle to use the radio and call for back up. *Id.* at 0:25 As he returned to where Mr. Lorentz was lying on the ground motionless, he once again pointed his firearm at him. *Id.* at 0:25-1:41. After Mr. Lorentz had been lying on the ground for approximately three minutes, Ranger Mitchell then approached and handcuffed him. *Id.* at 3:30. When he approached, Mr. Lorentz was not moving, and his eyes were

closed. *Id.* Ranger Mitchell then stood near his vehicle for approximately four minutes, went to check on Mr. Lorentz, tried to flip over his body, and then returned to his vehicle to put gloves on. *Id.* at 7:00- 7:40. He pulled out a first aid kit from the trunk of his vehicle and retrieved an oxygen mask. *Id.* at 12:00. He placed the oxygen mask on Mr. Lorentz approximately twelve minutes after shooting him in the chest. *Id.* at 12:10. In the footage, when Ranger Mitchell got closer to Mr. Lorentz, it appears that Mr. Lorentz had several scrapes and bruises on his face. *Id.* After putting the oxygen mask on Mr. Lorentz, Ranger Mitchell went back to his vehicle to drink coffee. *Id.* at 13:04. Then, Ranger Mitchell returned to where Mr. Lorentz was lying and started cutting Mr. Lorentz's clothes off of him. *Id.* at 13:04-14:28. He applied gauze to the gunshot wound in the middle of Mr. Lorentz's chest. *Id.* at 15:00-16:43.

Approximately nineteen minutes after Ranger Mitchell shot Mr. Lorentz in the chest, officers from the Eddy County Sherrif's Department arrived and attempted to perform CPR on Mr. Lorentz. Ex. G at 19:00-19:30. Their attempts failed, and Mr. Lorentz died from the gunshot wound to the chest. Ranger Mitchell testified that he did not find any weapons on Mr. Lorentz's person. Doc. 107-1 at 319:11-17.

Based on these facts, Plaintiffs bring two claims against the United States under 28 U.S.C. § 1346(b)(1), known as the Federal Tort Claims Act ("FTCA"). Plaintiffs claim in Count III of the Complaint that the United States is liable because Ranger Mitchell committed battery and false imprisonment against Mr. Lorentz. Doc. 1 at ¶¶ 114-124. Count IV of the Complaint alleges that the United States is liable because Ranger Mitchell breached his duty to act as a reasonable officer under the circumstances and negligently tased and then shot and killed Mr. Lorentz. Doc. 1 at ¶¶ 125-132. On the instant motion, Plaintiffs seek summary judgment on Counts III and IV only with

6

respect to Ranger Mitchell's initial decision to deploy his taser, arguing that the video evidence establishes that his actions were objectively unreasonable. Doc. 110 at 8.

## LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the initial burden of establishing that there is an absence of evidence to support the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant meets this burden, the non-movant must come forward with specific facts, supported by admissible evidence, that demonstrate the existence of a genuine dispute of material fact. *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1526 n. 11 (10th Cir. 1992). Facts are material if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In deciding a summary judgment motion, the court "construe[s] the factual record and the reasonable inferences therefrom in the light most favorable to the nonmoving party." *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005). However, the court may not "weigh the evidence, pass on the credibility of witnesses, or substitute [its] judgment for that of the jury." *Allen v. Wal-Mart Stores, Inc.,* 241 F.3d 1293, 1297 (10th Cir. 2001) (quoting *Kinser v. Gehl Co.,* 184 F.3d 1259, 1267 (10th Cir. 1999), *abrogated on other grounds by Weisgram v. Marley Co.,* 528 U.S. 440 (2000)).

## DISCUSSION

In Count III, Plaintiffs assert that the United States is liable for battery because Ranger Mitchell "used unreasonable and excessive force to effectuate the arrest" by tasing him, wrestling with him, shooting him in the leg, and shooting him in the chest, actions which a "reasonable officer" in his position would not have believed to be justified." Doc. 1 at ¶¶ 119-124. In Count

7

IV, Plaintiffs assert that the United States is liable for negligence, because "[i]n pursuing, threatening, tasing, shooting, and ultimately killing [Mr. Lorentz], [Ranger] Mitchell breached his duty to act as a reasonable officer under the circumstances." *Id.* at ¶¶ 128-132. Although Plaintiffs allege that Ranger Mitchell committed a battery and acted negligently both when he first tased Mr. Lorentz and when he fired the second fatal shot, the instant Motion focuses only on Ranger Mitchell's initial decision to tase Mr. Lorentz.

Plaintiffs' claims are predicated on the United States' waiver of sovereign immunity under the FTCA. *Ayala v. United States*, 49 F.3d 607, 610 (10th Cir. 1995). The FTCA "waive[s] the sovereign immunity of the United States for certain torts, [including negligent and wrongful acts and omissions resulting in injury or death,] committed by federal employees acting within the scope of their employment." *Brownback v. King*, 592 U.S. 209, 212 (2021) (citations omitted). Relevant here, the FTCA waiver applies only in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also* 28 U.S.C. § 2674 (stating that the United States is liable under the FTCA "in the same manner and to the same extent as a private individual under like circumstances"). Accordingly, "the government is not liable under the FTCA unless state law recognizes a comparable liability for private persons." *Ayala,* 49 F.3d at 611 (10th Cir. 1995). The court therefore must "look to the law of the state in which the alleged tortious activity occurred to resolve the question of liability under the FTCA," *id.,* which here is New Mexico. If the alleged tortious activity has no "private person analogue under New Mexico law," the federal court lacks subject matter jurisdiction over the claim. *Poncho-Alderete v. United States,* 22-CV-153, 2024 WL 2132394, at *11-12 (D.N.M. May 8, 2024) (citing *Brownback,* 592 U.S. at 212; *United States v. Agronics,* 164 F.3d 1343, 1346 (10th Cir. 1999)); *see also Murphy v. United*

*States,* 20-CV-557, 2020 WL 6939716, at *3 (D.N.M. Nov. 25, 2020) ("Determining whether the alleged facts in Plaintiff's complaint establish the requisite private person analogue for jurisdiction requires the Court to resolve whether New Mexico law would hold a private person similarly situated to the [government employees] negligent based on the alleged facts.").

Because Plaintiffs' battery and negligence claims turn on the same analysis of the reasonableness of Ranger Mitchell's actions, the Court will consider those claims together. With respect to the claims of battery, in New Mexico, "the elements of civil and criminal assault and battery are essentially identical." *New Mexico v. Ortega,* 827 P.2d 152, 155 (N.M. Ct. App. 1992). A tortfeasor is liable for battery if: "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive contact with the person of the other directly or indirectly results." *Id.* (quoting *Restatement (Second) of Torts* § 18(1)(a)-(b) (1965)); *see also* N.M. Stat. Ann. § 30–3–4 ("Battery is the unlawful, intentional touching or application of force to the person of another, when done in a rude, insolent or angry manner.") (defining the elements of criminal battery). As to the severity of contact, no actual injury to the plaintiff is required in order to establish liability. *See Selmeczki v. N.M. Dep't of Corr.,* 129 P.3d 158, 167 (N.M. Ct. App. 2006) ("It is black-letter law that causing an offensive touching, even indirectly to another's clothing and not resulting in injury, is the tort of battery.").

When making lawful arrests, law enforcement officers generally enjoy a privilege to use whatever force is "reasonably necessary" for the enforcement of the law. *Hernandez v. Parker,* 508 P.3d 947, 958 (N.M. Ct. App. 2022) (citing *Reynaga v. County of Bernalillo,* 64 F.3d 670 (10th Cir. 1995) (unpublished table opinion)); *see also Mead v. O'Connor,* 344 P.2d 478, 479-80 (N.M. 1959) ("Officers, within reasonable limits, are the judges of the force necessary to enable them to make

9

arrests or preserve the peace."). However, when officers act unreasonably and use excessive force, they may be liable for civil battery. *Id.*

In a civil battery suit based on the actions of a law enforcement officer, the relevant analysis "includes both an objective and a subjective test," and thus is different from the Fourth Amendment excessive force analysis, which is "famously a strictly objective test." *Cruz v. City of Deming*, 138 F.4th 1257, 1272 (10th Cir. 2025) (citation omitted); *see also Hernandez,* 508 P.3d at 958 ("[T]he traditional defenses for law enforcement to assert in response to civil assault and battery claims are not the same as the 'objectively reasonable officer' standard that is at the root of the Fourth Amendment analysis."). Accordingly, the officer "must subjectively believe that he or she used no more force than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the same situation." *Hernandez*, 508 P.3d at 958; *see also Cruz,* 138 F.4th at 1272 (holding the same). As to the objective portion of this analysis, New Mexico courts apply the factors set out in *Graham v. Connor,* 490 U.S. 386 (1989). *See State v. Ellis,* 186 P.3d 245, 251 (N.M. 2008) (citing and applying the *Graham* factors in determining whether a reasonable jury could find that an officer used excessive force against the defendant). In *Graham,* the Supreme Court held that when considering the objective reasonableness of an officer's actions, courts must assess the totality of the circumstances, "including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396.

The reasonableness of an officer's use of force is similarly central to the determination of a negligence claim brought on the basis of such force, as New Mexico's privilege for law enforcement officers to use reasonable force "applies not only to assault and battery claims, but also to negligence and recklessness claims." *Serrano v. United States*, 766 F. App'x 561, 568 (10th

Cir. 2019) (citing *Alaniz v. Funk*, 364 P.2d 1033, 1034-36 (N.M. 1961)). Accordingly, in a negligence suit based on the actions of a law enforcement officer, such officer "has the duty in any activity actually undertaken to exercise for the safety of others that care ordinarily exercised by a reasonably prudent and qualified officer in light of the nature of what is being done." *Cross v. City of Clovis*, 755 P.2d 589, 591 (1988). Ultimately, "the defendant bears the burden to establish the defense or privilege" of reasonableness. *Cruz,* 138 F.4th at 1272. Notably, "in state court, the question of reasonableness is generally reserved for the jury." *Hernandez,* 508 P.3d at 959.

Relevant here, Plaintiffs allege that Ranger Mitchell committed a battery against Mr. Lorentz and breached his duty of reasonable care when he first deployed his taser. They argue that the Court must grant their summary judgment motion because the video evidence establishes as a matter of law that Ranger Mitchell's initial decision to deploy his taser was objectively unreasonable. As an initial matter, the United States correctly notes that there is evidence that after being tased, Mr. Lorentz was either not actually shocked or, at the very least, was unaffected by the shock. Doc. 107 at 12. Based on this evidence, the United States contends that the tasing could not have been excessive. *Id.* The law is clear, however, that no actual injury to the plaintiff is required in order to establish liability for civil battery. *Selmeczki,* 129 P.3d at 167. Thus, the United States' argument is inapposite, and the Court must apply the *Graham* factors to determine objective reasonableness.

Taking the evidence in the light most favorable to the United States, the Court finds that there is a genuine question of material fact regarding the objective reasonableness of Ranger Mitchell's actions, as a reasonable jury could find that his actions were not excessive. As stated above, the Court considers the *Graham* factors to determine objective reasonableness.

Regarding the first factor, the severity of the offense, the parties agree that Ranger Mitchell was investigating a misdemeanor traffic offense. This factor thus weighs against the United States.

The "second Graham factor, whether the suspect posed an immediate threat to the safety of the officers or others, is undoubtedly the most important and fact-intensive factor in determining the objective reasonableness of an officer's use of force." *Pauly v. White,* 874 F.3d 1197, 1215-16 (10th Cir. 2017) (cleaned up). "Under the second factor, an officer may use increased force when a suspect is armed, repeatedly ignores police commands or makes hostile motions towards the officer or others." *Donahue v. Wihongi,* 948 F.3d 1177, 1196 (10th Cir. 2020). Courts must also consider the "manifest intentions of the suspect" and the distance between the suspect and the officer. *Estate of Larsen ex rel. Sturdivan v. Murr,* 511 F.3d 1255, 1260 (10th Cir. 2008). Here, although Mr. Lorentz followed Ranger Mitchell's order to step towards a nearby fence, he shook his head and said "No" when Ranger Mitchell told him to turn around. When Ranger Mitchell displayed his taser, Mr. Lorentz said, "Oh come on, get real with it, other one," and gestured to Ranger Mitchell to come towards him. Mr. Lorentz, again defying Ranger Mitchell's order to turn around, then stepped towards Ranger Mitchell. Not only did Mr. Lorentz repeatedly defy Ranger Mitchell's order to turn around, but he also made a hostile motion to Ranger Mitchell when he gestured for him to approach while telling him to "get real with it," a statement that indicated his intention to escalate the encounter, as he was likely referring to Ranger Mitchell's firearm. From the video footage, it appears that Mr. Lorentz was not far from Ranger Mitchell, and in fact he took steps towards Ranger Mitchell after refusing to turn around, closing the distance between them even further, thereby making the situation more potentially dangerous. Although it was unclear in the moment whether Mr. Lorentz was armed, his repeated refusal to cooperate, his hostile motion, his manifest intent to escalate the encounter, and the short distance between Ranger Mitchell and

12

Mr. Lorentz all weigh in favor of finding that Mr. Lorentz posed a threat to Ranger Mitchell. *Donahue,* 948 F.3d at 1196; *Larsen,* 511 F.3d at 1260.

Similarly, as to the third factor, whether the suspect was actively resisting arrest, Ranger Mitchell instructed Mr. Lorentz to turn around in order to arrest him, and Mr. Lorentz refused to do so. Mr. Lorentz thus was actively resisting arrest. For this reason, this factor weighs against Plaintiffs.

Accordingly, the only *Graham* factor that weighs against a finding of reasonableness is the first factor, the severity of the offense, while the second and most important *Graham* factor, whether the suspect posed a threat, and the third *Graham* factor, the suspect's resistance to arrest, support a finding that Ranger Mitchell's actions were reasonably necessary. On balance, the *Graham* factors thus weigh in favor of a finding of reasonableness.

Plaintiffs' arguments to the contrary are unavailing. First, Plaintiffs highlight the fact that Ranger Mitchell did not smell marijuana or alcohol on Mr. Lorentz and argue that this fact indicates that Ranger Mitchell's actions were unreasonable and unnecessary. Doc. 110 at 5. However, whether a suspect is intoxicated is not one of the *Graham* factors; this fact thus does not change the above analysis. Next, Plaintiffs assert that Ranger Mitchell's actions were objectively unreasonable because he failed to warn Mr. Lorentz that he was going to deploy his taser. *Id.* at 10. In support of this argument, Plaintiffs cite to three Tenth Circuit cases finding that an officer used excessive force when they deployed their taser on a nonviolent misdemeanant without warning. These cases are readily distinguishable from the instant case. First, Plaintiffs cite to *Casey v. City of Federal Heights,* in which the Court held that an officer's decision to tase a suspect "immediately and without warning" was objectively unreasonable. 509 F.3d 1278 (10th Cir. 2007). Notably, the Court found in *Casey* that none of the *Graham* factors weighed in favor of the officer.

13

*Id.* at 1285. Next, Plaintiffs cite to *Cavanaugh,* in which the Tenth Circuit found that the tasing of a suspect who was "neither actively resisting or fleeing arrest" and whose arms were "clearly visible by her side" was unreasonable. 625 F.3d at 662-65. Third, Plaintiffs cite to *Emmett v. Armstrong,* in which the Tenth Circuit found that it was objectively unreasonable for the officer to deploy his taser because by the time he did, the suspect was "visibly relaxed, laughing, and had ceased any active resistance." 973 F.3d 1127, 1136 (10th Cir. 2020). While the lack of warning may be problematic where the totality of the circumstances based on a consideration of the *Graham* factors demonstrates the unreasonableness of the officers' actions, the totality of the circumstances in the instant case differs in important ways from that in the cases cited by Plaintiffs. In contrast to the suspects in *Casey, Cavanaugh,* and *Emmett,* Mr. Lorentz resisted Ranger Mitchell's order to turn around, made a hostile motion for Ranger Mitchell to come towards him, and had his hands in his pockets. Nothing in those cases suggests that the lack of warning under these circumstances would automatically render Ranger Mitchell's decisions unreasonable. Indeed, the *Casey* court was careful not to make a per se rule that any tasing of a nonviolent misdemeanant without warning is categorically unreasonable. *Id.* ("[W]e do not rule out the possibility that there may be circumstances in which the use of a Taser against a nonviolent offender is appropriate."). Accordingly, the Court finds that even without a warning, viewing the evidence in the light most favorable to the United States, the *Graham* factors weigh in favor of Ranger Mitchell. Accordingly, a reasonable jury could find that Ranger Mitchell's decision to tase Mr. Lorentz was reasonably necessary in the face of Mr. Lorentz's behavior.

Of course, for the law enforcement officer privilege to apply under New Mexico law, the burden is on the defendant to establish that the officer subjectively believed that his actions were reasonably necessary. Thus, even if there is a question of material fact as to the objective

14

reasonableness of Ranger Mitchell's decision to tase Mr. Lorentz, if the United States cannot establish that he subjectively believed that his actions were necessary, then the privilege would not apply, and the United States would be liable.

With respect to Ranger Mitchell's subjective beliefs, in his deposition testimony, he stated that he first deployed his taser because, when Mr. Lorentz told him to get the "other one," he believed that Mr. Lorentz was referring to his gun and intended to escalate the encounter or become aggressive. Doc. 107-1 at 324:9-11. The United States has therefore presented evidence that Ranger Mitchell subjectively believed that his actions were reasonably necessary. However, there is also evidence from Ranger Mitchell's own deposition that put his credibility into question. During his deposition, Ranger Mitchell conceded that, although he had earlier given a statement to investigating officers that he had fired the second shot as he was backing away from Mr. Lorentz, he "realized now," after watching the body-worn camera footage, that in fact he had shot Mr. Lorentz while he was holding him down on the ground. Doc. 68-5; 107-1 at 249:9-15, 246:17-21. Ranger Mitchell also admitted that, during the "walkthrough" of the incident, he told investigators that before firing the second shot, Mr. Lorentz had stood up and was "coming for [him]." *Id.* at 251:17-21. The footage from the body-worn camera shows otherwise, as Ranger Mitchell clearly fired the second shot while holding Mr. Lorentz down on the ground. When asked why he told investigating officers that Mr. Lorentz was coming for him, Ranger Mitchell testified, "It was what I remembered at the time." *Id.* at 252:3. Plaintiffs further note that Ranger Mitchell's testimony is unreliable because he does not have a clear memory of when Mr. Lorentz touched his gun, *id.* at 353:17-21, nor does he remember when he pulled the trigger the second time. *Id.* at 260:19-22.

From Ranger Mitchell's own testimony, there is evidence that he subjectively believed that his actions were reasonably necessary, but there is also evidence that his memory is unreliable, and

15

that his previous statements contradict incontrovertible evidence. Faced with this conflicting evidence, an issue of fact remains as to whether Ranger Mitchell believed that his actions were reasonably necessary. At the summary judgment stage, the Court cannot weigh evidence or assess a witness's credibility. *Allen,* 241 F.3d at 1297. Further, "summary judgment is improper where an issue turns on credibility." *Nat'l Aviation Underwriters, Inc. v. Altus Flying Service, Inc.,* 555 F.2d 778, 784 (10th Cir. 1977). The Court cannot usurp the function of the jury and assess the testimony of Ranger Mitchell, whose culpability, or lack thereof, is central to Plaintiffs' case. Accordingly, the Court finds that the question of Ranger Mitchell's subjective belief of the reasonableness of his actions must be reserved for the jury, and cannot be resolved by the Court as a matter of law.

## CONCLUSION

Taking the evidence in the light most favorable to the United States as the non-movant, the Court finds that the *Graham* factors weigh in favor of finding that Ranger Mitchell's actions were reasonable. Because a reasonable jury could find against Plaintiffs, there is a genuine question of material fact as to the objective reasonableness of Ranger Mitchell's decision to tase Mr. Lorentz. Furthermore, the question of whether Ranger Mitchell subjectively believed that his actions were reasonably necessary is best reserved for the jury. For these reasons, the Court cannot determine, as a matter of law, that Ranger Mitchell committed the torts of battery and negligence when he first tased Mr. Lorentz. The Court thus must deny Plaintiffs' motion for summary judgment in their favor.

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment is **DENIED.**

DATED this 1st day of July 2026.

_____
MARTHA VÁZQUEZ
Senior United States District Judge

16